**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 25-7044**

OSCAR ENRIQUE LOPEZ GARCIA,

Petitioner – Appellee,

v.

ROBERT GUADIAN, in his official capacity as Director of the Washington Field Office of U.S. Immigration and Customs Enforcement; MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; TODD BLANCHE, in his official capacity as Attorney General of the United States,

Respondents – Appellants,

and

PAUL PERRY, in his official capacity as Warden of Caroline Detention Facility,

Respondent.

------------------------------

IMMIGRATION LAW SCHOLARS; CALIFORNIA; MARYLAND; NEW YORK; ARIZONA; COLORADO; CONNECTICUT; DELAWARE; HAWAII; ILLINOIS; MAINE; MASSACHUSETTS; MICHIGAN; MINNESOTA; NEVADA; NEW JERSEY; OREGON; RHODE ISLAND; VERMONT; VIRGINIA; WASHINGTON; THE DISTRICT OF COLUMBIA; AMERICAN IMMIGRATION COUNCIL; AMERICAN IMMIGRATION LAWYERS ASSOCIATION,

Amici Supporting Appellee.

**No. 25-7050**

JUAN JOSE RIVERA,

Petitioner – Appellee,

v.

ROBERT GUADIAN, in his official capacity as Director of the Washington Field Office of U.S. Immigration and Customs Enforcement; DAVID J. VENTURELLA, in his official capacity as Acting Director, Immigration and Customs Enforcement, U.S. Department of Homeland Security; MARKWAYNE MULLIN, in his official capacity as Secretary of the U.S. Department of Homeland Security; TODD BLANCHE, in his official capacity as Attorney General of the United States,

Respondents – Appellants,

and

PAUL PERRY, in his official capacity as Warden of Caroline Detention Facility,

Respondent.

------------------------------

IMMIGRATION LAW SCHOLARS; CALIFORNIA; MARYLAND; NEW YORK; ARIZONA; COLORADO; CONNECTICUT; DELAWARE; HAWAII; ILLINOIS; MAINE; MASSACHUSETTS; MICHIGAN; MINNESOTA; NEVADA; NEW JERSEY; OREGON; RHODE ISLAND; VERMONT; VIRGINIA; WASHINGTON; THE DISTRICT OF COLUMBIA; AMERICAN IMMIGRATION COUNCIL; AMERICAN IMMIGRATION LAWYERS ASSOCIATION,

Amici Supporting Appellee.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Patricia Tolliver Giles, District Judge. (1:25-cv-01764-PTG-WEF; 1:25-cv-01793-PTG-WBP)

Argued: May 5, 2026 Decided: September 10, 2026

Before RUSHING and BERNER, Circuit Judges, and KEENAN, Senior Circuit Judge.

Affirmed by published opinion. Judge Berner wrote the opinion, in which Senior Judge Keenan concurred. Judge Rushing wrote a dissenting opinion.

**ARGUED:** Benjamin Timothy Hayes, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. My Khanh Ngo, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, San Francisco, California, for Appellees. **ON BRIEF:** Brett A. Shumate, Assistant Attorney General, Yaakov M. Roth, Principal Deputy Assistant Attorney General, Drew C. Ensign, Deputy Assistant Attorney General, Keith I. McManus, Kohsei Ugumori, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Judy Rabinovitz, Natalie Behr, New York, New York, Michael K.T. Tan, Oscar Sarabia Roman, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, San Francisco, California; Sarah Beth Pitney, Ava Benach, Bianca Granados, BENACH PITNEY REILLY LLP, Washington, D.C.; Sophia Leticia Gregg, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia; Simon Y. Sandoval-Moshenberg, MURRAY OSORIO PLLC, Falls Church, Virginia; Sarnata Reynolds, CEARTAS SOLUTIONS, Takoma Park, Maryland, for Appellees. Amit Jain, Kathleen Pleiss, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Washington, D.C., for Amici Immigration Law Scholars. Rob Bonta, Attorney General, Michael L. Newman, Senior Assistant Attorney General, Robin L. Goldfaden, Supervising Deputy Attorney General, Marissa Malouff, Supervising Deputy Attorney General, Julia Heming Segal, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, San Francisco, California, for Amicus State of California. Anthony G. Brown, Attorney General, Julia Doyle, Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland. Letitia James, Attorney General, Barbara D. Underwood, Solicitor General, Philip J. Levitz, Senior Assistant Solicitor General, Gillian Barna, Assistant Solicitor General, Julie Dona, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York. Kristin K. Mayes, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona, for Amicus State of Arizona. Philip J. Weiser, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF COLORADO, Denver, Colorado, for Amicus State of Colorado. William Tong, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut. Kathleen Jennings, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF

DELAWARE, Wilmington, Delaware, for Amicus State of Delaware. Brian L. Schwalb, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus District of Columbia. Anne E. Lopez, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF HAWAI'I, Honolulu, Hawai'i, for Amicus State of Hawai'i. Kwame Raoul, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois. Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine. Andrea Joy Campbell, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts, for Amicus Commonwealth of Massachusetts. Dana Nessel, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota. Aaron D. Ford, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEVADA, Carson City, Nevada, for Amicus State of Nevada. Jennifer Davenport, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey. Dan Rayfield, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon. Peter F. Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island. Charity R. Clark, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Jay Jones, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia. Nicholas W. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington. Emma Winger, Rebecca Cassler, Suchita Mathur, AMERICAN IMMIGRATION COUNCIL, Washington, D.C., for Amici American Immigration Council and American Immigration Lawyers.

BERNER, Circuit Judge:

The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), enacted by Congress thirty years ago, created the current scheme for detention of noncitizens pending removal proceedings. One provision of IIRIRA requires that certain noncitizens be detained throughout their removal proceedings. Another provision allows for other noncitizens to be released pending removal after a bond hearing before an immigration judge. The question before us is which part of IIRIRA applies to Petitioners Oscar Enrique Lopez Garcia and Juan Jose Rivera. There is a growing split among federal circuit courts of appeal on this question.

Lopez Garcia and Rivera are noncitizens who have lived in the United States for decades after having entered the country without inspection and authorization. Each was taken into immigration detention in October 2025 following encounters with immigration authorities. If either had been detained only four months prior, he would have been provided a bond hearing before an immigration judge and an opportunity to seek release on bond pending the outcome of immigration removal proceedings. That is because before July 2025, noncitizens like Lopez Garcia and Rivera were generally released on bond unless one or more of the following circumstances applied: the noncitizen had committed a certain crime, the noncitizen was considered a flight risk, or the noncitizen posed a danger to his community.

The Government does not contend that any of these circumstances applies to Lopez Garcia or Rivera. Yet neither was permitted a bond hearing because, starting in July 2025, the Government began to construe IIRIRA to require all noncitizens who entered the

country without inspection and authorization be detained throughout their immigration removal proceedings.

Petitioners Lopez Garcia and Rivera moved for habeas corpus relief in federal district court. They argued that the Government's new construction of IIRIRA is wrong and that they were being detained in violation of their rights to due process. The district court agreed and granted their petitions. The Government sought expedited appeal, which this court granted. Today we join the overwhelming majority of circuit courts of appeal that have considered this question in holding that IIRIRA and its implementing regulations, properly construed, require noncitizens like Lopez Garcia and Rivera be provided a bond hearing and be eligible for release pending removal. Accordingly, we affirm the district court's grants of habeas relief.

## I. Background

Petitioner Oscar Enrique Lopez Garcia came to the United States from Guatemala as a child in 1996. He entered without inspection and authorization from immigration authorities. He has lived and worked in Washington, D.C. for more than thirty years. Lopez Garcia is married and is the father of two United States citizen children. On October 9, 2025, Lopez Garcia was on his way to work when he was detained by agents of the United States Immigration and Customs Enforcement (ICE) and taken into custody.

Petitioner Juan Jose Rivera left his birthplace of El Salvador and came to the United States in 2005 at the age of twenty-six. He too entered the country without inspection and authorization. Rivera has lived and worked in the United States for the past twenty years.

He has never been arrested or charged with any crime. On October 2, 2025, ICE detained him near his home in Washington, D.C., and took him into custody.

Following their detention, ICE initiated removal proceedings against Lopez Garcia and Rivera on the ground that they entered the country without inspection and authorization. During this time, the men were held at an ICE detention facility in Virginia without a bond hearing.

A bond hearing is a court proceeding where an immigration judge determines whether a noncitizen[1] should be detained or released while his immigration proceedings advance. *See* 8 C.F.R. §§ 236.1(d), 1003.19, 1236.1(d). If the noncitizen establishes that he is not a danger to the community or a flight risk, the immigration judge can order his release. *Miranda v. Garland*, 34 F.4th 338, 346 (4th Cir. 2022). The immigration judge may set a bond or place certain conditions on the noncitizen's release. *Id.*

Not all noncitizens are eligible for bond during their removal proceedings, however. Noncitizens who are detained pursuant to 8 U.S.C. § 1226(a) are eligible for bond, while noncitizens detained pursuant to 8 U.S.C. § 1225(b)(2)(A) are not.

Had they encountered immigration authorities prior to July 2025, the Government would have detained Lopez Garcia and Rivera pursuant to 8 U.S.C. § 1226(a) and provided them with a bond hearing. In July 2025, however, the Department of Justice announced that, going forward, a new construction of the existing immigration laws would be applied

---

[1] The INA defines the term "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). We use the term "noncitizen" as equivalent to the statutory term "alien." *Nasrallah v. Barr*, 590 U.S. 573, 578 n.2 (2020). We use the term "alien" only when quoting the statute directly.

to noncitizens who entered the country without authorization or inspection. *See* U.S. Immigr. & Customs Enf't, Interim Guidance Regarding Detention Authority for Applicants for Admission (July 8, 2025). Under this new construction, the Government would detain such noncitizens under Section 1225(b)(2)(A), not under Section 1226(a). Thus, Lopez Garcia and Rivera were subjected to mandatory detention without a bond hearing. *Id.*[2]

Lopez Garcia and Rivera petitioned for habeas corpus relief from a federal district court, alleging that their detention without a bond hearing was unlawful. They contended that they should be detained under Section 1226(a), not Section 1225(b)(2)(A), and provided with a bond hearing. They also claimed that the Government's failure to provide a bond hearing violated their rights to due process under the Fifth Amendment of the United States Constitution.

The district court granted both Lopez Garcia's and Rivera's petitions for relief. The district court concluded in each case that Section 1226(a), not Section 1225(b)(2)(A), applied to the Petitioners and therefore they were entitled to bond hearings. *See* Order at 3, *Lopez Garcia v. Perry*, No. 1:25-CV-1764, ECF No. 6 (E.D. Va. Nov. 14, 2025); Order at

[2] Following the Government's changed position, the Board of Immigration Appeals issued a decision adopting this new construction. *See Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025).

3, *Rivera v. Crawford*, No. 1:25-CV-1793, ECF No. 8 (E.D. Va. Nov. 14, 2025).[3] During the subsequent bond hearings, immigration judges concluded that Lopez Garcia and Rivera posed no danger to the community or a risk of flight. In November 2025, both men were released from detention on bond. The Government timely appealed the decisions granting habeas relief and the cases were consolidated on appeal. We possess jurisdiction under 28 U.S.C. §§ 1291 and 2253(a).

## II. Statutory Framework

The Constitution vests Congress with the power to establish requirements for naturalization. U.S. Const. art. 1, § 8, cl. 4. Congress, not the Executive Branch, possesses plenary power over the admission and exclusion of noncitizens. *Arizona v. United States*, 567 U.S. 387, 394–96 (2012). As we are called upon to construe a law enacted by Congress pursuant to this power, we begin by laying out the statutory context.

### A. Immigration & Nationality Act of 1952

The first one hundred years after the founding of the United States of America marked a period of relatively open borders without federal restrictions on immigration.

[3] The district court granted habeas relief and ordered that the Government provide the Petitioners "with a standard bond hearing pursuant to 8 U.S.C. § 1226(a)." *See, e.g.*, Parties' Joint Appendix 81. In its decision, however, the district court improperly inverted the burden of proof at bond hearings. To clarify, it is the Petitioner, not the Government, who bears the burden under the processes established by the Attorney General to demonstrate he is not a danger to the community nor a flight risk. *Miranda v. Garland*, 34 F.4th 338, 356 (4th Cir. 2022).

*Padilla v. Kentucky*, 559 U.S. 356, 360 (2010). It was not until the late 1800s that Congress began to enact laws restricting entry into the United States and providing for the brief detention of those arriving at our borders. *Id.* Throughout the late nineteenth and early twentieth centuries, Congress passed a patchwork of immigration laws, including the predecessor statutes to Section 1225 and Section 1226, the statutes at issue in this case.

Historically, our immigration laws have always distinguished between immigrants who recently arrive at our borders and those already present in the United States, even those who entered unlawfully. *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953); *accord Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("The distinction between a[ ] [noncitizen] who has effected an entry into the United States and one who has never entered runs throughout immigration law."). This distinction is rooted in part in the Due Process Clause of the United States Constitution, which applies to all "persons" within the United States. *See Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The fourteenth amendment to the constitution is not confined to the protection of citizens" but rather applies "to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality[.]"); *accord Zadvydas*, 533 U.S. at 693.

This distinction has long applied to detention during removal proceedings. The Immigration Act of 1893 first provided for brief mandatory detention for those arriving in the United States who were not "clearly and beyond doubt entitled to admission." Section 5, 27 Stat. 569, 570. The language of this statute echoes in its modern-day equivalent, Section 1225. Starting in 1891 and continuing until June 2025, Section 1225(b)(2)(A) and its predecessor statutes have been applied to immigrants at our borders. *See* Brief for

Immigration Law Scholars as *Amicus Curiae* at 7–13. For nearly as long, our immigration laws also permitted noncitizens apprehended within the United States to be released pending removal proceedings, regardless of how they entered our country. *See* Lindsay Nash, *Resurrecting Immigration Releases*, 135 Yale L.J. 1533, 1586–1607 (2026).

In 1952, Congress enacted the Immigration and Nationality Act (INA) to compile the various provisions of immigration law into a single comprehensive federal statutory framework. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011); *see also United States v. Sanchez-Garcia*, 98 F.4th 90, 94 (4th Cir. 2024). Notably, the INA preserved the long-held "distinction between those [noncitizens] who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality." *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958).

B. <u>The Illegal Immigration Reform & Immigrant Responsibility Act of 1996</u>

Though Congress has amended this statutory framework multiple times since 1952, the INA has endured and continues to govern our immigration system. *Kansas v. Garcia*, 589 U.S. 191, 195 (2020). This appeal calls upon us to interpret certain amendments Congress made to the INA through the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009 (1996).

IIRIRA "overhauled numerous sections" of the INA, including the immigration removal processes. *Orquera v. Ashcroft*, 357 F.3d 413, 417 (4th Cir. 2003); *see also William v. Gonzales*, 499 F.3d 329, 330 (4th Cir. 2007). Prior to 1996, the United States maintained two entirely different processes for removing noncitizens: "deportation

proceedings" and "exclusionary proceedings." Noncitizens present in the United States, regardless of whether they entered the country legally, were removed through "deportation proceedings." *See* 8 U.S.C. § 1252(a)(1) (1995). Noncitizens arriving at the border were subject to "exclusionary proceedings." *See id.* U.S.C. § 1225(a)–(b) (1995).

Before IIRIRA, the process and rights accorded to noncitizens turned on whether the individual was physically present in the United States. Following IIRIRA, these distinctions turn instead on *lawful entry* to the United States. IIRIRA uses the terms, "admission" and "admitted," to describe "the lawful entry of the [noncitizen] into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). Today, all noncitizens, regardless of whether they are in the country or arriving at the border, are subject to a single removal process under 8 U.S.C. § 1229a. This process is known as "removal proceedings."

A noncitizen is considered "removable" if he 1) was never lawfully admitted to the United States and is charged as "inadmissible" under Section 1182, or 2) was lawfully admitted to the United States but is now charged as "deportable" for some reason, such as committing a crime or overstaying a visa, under Section 1227. *Id.* § 1229a(e)(2). Those who are "inadmissible" and those who are "deportable" bear different burdens of proof during removal proceedings: Noncitizens who have not been lawfully admitted must establish that they are "clearly and beyond a doubt entitled to be admitted." *Id.* § 1229a(c)(2). In contrast, noncitizens who have been admitted need only show "by clear and convincing evidence" that they are present in the United States lawfully. *Id.*

To summarize: Prior to IIRIRA, noncitizens present in the United States without inspection and authorization were subject to deportation proceedings, and subject to the same burden of proof as those lawfully in the country. Following IIRIRA, noncitizens who entered the country without inspection and authorization bear the same burden of proof in removal proceedings as noncitizens arriving at the border.

Our focus today is on the detention provisions of IIRIRA during these removal proceedings. Two sections of IIRIRA, 8 U.S.C. §§ 1225 and 1226, govern the detention of noncitizens. Section 1225 requires mandatory detention for certain noncitizens whereas Section 1226 allows for other noncitizens to be released on bond pending the outcome of their removal proceedings.

Under Section 1225(b)(2)(A), "an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained" pending removal proceedings. 8 U.S.C. § 1225(b)(2)(A). Section 1226 provides that, in the case of a noncitizen arrested and detained within the United States, "an alien may [be] release[d]" on "bond." 8 U.S.C. § 1226(a).

This case calls upon us to determine which statutory section applies to noncitizens like the Petitioners who have 1) not been lawfully admitted to the United States and 2) are arrested and detained within the United States. The Government argues that Section 1225(b)(2)(A) applies because the Petitioners, having not been lawfully admitted to the country, are applicants for admission seeking to be admitted. The Government further

points to IIRIRA's focus on lawful entry, rather than physical presence, as evidence of congressional intent to change the scope of the detention provisions.

The Petitioners assert that Section 1226(a) applies because they were arrested and detained within the United States and are not currently seeking admission into the country. They argue that this reading of the statute is consistent with the plain text of the statute and the universal interpretation of the statute over the past thirty years.

With this statutory framework in mind, we turn to the question before us on appeal: whether the district court properly granted habeas relief to Lopez Garcia and Rivera when it concluded that Section 1226 governed their detention and that they were, therefore, entitled to a bond hearing. We review a district court's grant of habeas relief *de novo* with respect to issues of law and for clear error with respect to findings of fact. *Wolfe v. Clarke*, 691 F.3d 410, 413, 423 (4th Cir. 2012).

## III. Analysis

For nearly three decades, all three branches of the federal government interpreted Section 1226 to apply to noncitizens—like Petitioners Lopez Garcia and Rivera—present in the United States without inspection and admission, and Section 1225 to apply to noncitizens arriving at our borders. The Petitioners are among thousands of noncitizens in the United States swept up and detained without bond as a result of the Government's newly adopted construction of Section 1225. "To no one's surprise and as the [G]overnment has acknowledged, this change in policy has led to a 'tsunami' of habeas

petitions" filed across the country. *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 509 n.3 (5th Cir. 2026) (Douglas, J., dissenting).

In response to this tsunami, hundreds of federal district courts have considered the question we consider today. The overwhelming majority—over five hundred—rejected the Government's new construction and sided with the petitioners in over twenty thousand individual cases.[4] The debate has now reached every numbered United States court of appeals and has led to a circuit split. The First, Second, Third, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits concluded that Section 1226 applies to noncitizens inside our country, like the Petitioners, and that they must thus be provided a bond hearing. *Guerrero Orellana v. Moniz*, --- F.4th ---, 2026 WL 2352042 (1st Cir. Aug. 13, 2026); *Barbosa da Cunha v. Freden*, 175 F.4th 61 (2d Cir. 2026); *Buele Morocho v. Warden Philadelphia FDC*, --- F.4th ---, 2026 WL 2546223 (3d Cir. Aug. 28, 2026); *Lopez-Campos v. Raycraft*, 175 F.4th 713 (6th Cir. 2026); *Cirrus Rojas v. Olson*, 183 F.4th 909 (7th Cir. 2026); *Rodriguez Vazquez v. Bostock*, 183 F.4th 1160 (9th Cir. 2026); *Santillan Quiroz v. Mullin*, 180 F.4th 1226 (10th Cir. 2026); *Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami*, 175 F.4th 1258 (11th Cir. 2026). The Fifth and Eighth Circuits ruled, on the other hand, that Section 1225 applies to all noncitizens who have not been admitted to the United States

[4] In the midst of this dramatic increase in workload, district courts across the country have admirably risen to the occasion, issuing carefully researched and meticulously analyzed opinions. Though too numerous to recognize individually, their work on this topic has greatly aided our review. *See, e.g.*, *Rodriguez v. Bostock*, 802 F. Supp. 3d 1297 (W.D. Wash. 2025); *Pablo Sequen v. Albarran*, 806 F. Supp. 3d 1069 (N.D. Cal. 2025); *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475 (S.D.N.Y. 2025).

and therefore they must be detained without bond. *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026) (concluding that Section 1225 applies); *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026). We benefit from the careful consideration and thoughtful analysis of our colleagues.

As is readily apparent from the circuit split, the statutory provisions before us lack clarity. When faced with an unclear statute, we must "use every tool at [our] disposal [to] determine the best reading of the statute[.]" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). These tools are known as the canons of statutory interpretation. *Valladares v. Ray*, 130 F.4th 74, 80–81 (4th Cir. 2025).

Putting all of our tools of statutory construction to work, we hold that Section 1226, not Section 1225, applies to noncitizens who, like the Petitioners, have been present in the United States for years regardless of how they entered our country. Our holding accords with the text, structure, context, and purpose of the INA as well as its universally accepted application for the past three decades. Though the Government's construction finds some support in the text, it suffers several fatal defects. It renders entire portions of the INA meaningless, calls into question amendments to the statute in the intervening decades, including the recent passage of the Laken Riley Act, and raises significant constitutional concerns.

If we were to agree with the Government's construction, we would need to conclude that, in passing IIRIRA thirty years ago, Congress intended to direct the single largest mass detention of human beings in our nation's history. Section 1225 simply "cannot bear the weight of the millions of noncitizens it would potentially subject to detention without

bond." *Santillan Quiroz*, 180 F.4th at 1242; *see also Learning Res., Inc. v. Trump*, 607 U.S. 229, 240 (2026). We therefore affirm the district court's grants of habeas relief.

## A. Plain Text

As with all questions of statutory interpretation, we begin with the text of the statute. *Copley v. United States*, 959 F.3d 118, 123 (4th Cir. 2020). We look to "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

We first consider whether the plain text of Section 1226(a) applies to noncitizens like the Petitioners. We find that it does.

We then consider whether the plain text of Section 1225(b)(2)(A) applies to Petitioners, thereby displacing Section 1226(a) as the controlling detention provision. This requires us to delve into and consider a number of statutory provisions in Section 1225. Because we conclude that the plain text of Section 1225(b)(2)(A) is ambiguous, we then turn to principles of statutory construction to determine the best reading of the statute.

### *i. Section 1226*

We begin by examining the plain text of Section 1226. Section 1226(a) authorizes that, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). "Except as provided in subsection" 1226(c), a noncitizen arrested under Section 1226 can be released on bond or conditional parole during removal proceedings. *Id.* § 1226(a)(1)–(2).

The word "removed" in Section 1226(a) applies broadly to both inadmissible noncitizens present without authorization and now charged as inadmissible, like Petitioners, and previously admitted noncitizens who are now charged as deportable. This plain reading is supported by the text of other INA sections as well. Where Congress cared to distinguish between inadmissible and deportable noncitizens, it did so. *See, e.g.*, *id.* § 1229a(c)(2) (distinguishing the burden of proof in removal proceedings for those who are inadmissible and those who are deportable).

The plain reading of Section 1226(a)—that it applies to noncitizens present in the United States without inspection and authorization—is further affirmed through the exceptions contained in Section 1226(c), which explicitly call for the mandatory detention of noncitizens present in the country without lawful admission who commit certain crimes. 8 U.S.C. § 1226(c)(1)(E). When Congress provides "specific exceptions" to a general rule, it "proves" that the general rule applies in all other circumstances. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010). Otherwise, "the statutory exceptions would be unnecessary." *Id.*

Section 1226(c) "carves out a statutory category of [noncitizens] who may *not* be released under § 1226(a)." *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018). This category includes both noncitizens who are *deportable* because they committed a crime enumerated in the statute and noncitizens who are *inadmissible* because they committed these crimes within the United States. *See* 8 U.S.C. §§ 1226(c)(1)(A)–(D). Congress amended Section 1226 with the passage of the Laken Riley Act in 2025. The Laken Riley Act added yet another carve-out to Section 1226(a) for noncitizens who are present in the United States

without being admitted or paroled and have been charged with, arrested for, convicted of, or have admitted committing a set of enumerated crimes. 8 U.S.C. § 1226(c)(1)(E)(i)–(ii).

Section 1226 unambiguously applies to noncitizens, like the Petitioners, who are present in the United States without being admitted or paroled. The Petitioners were detained inside the United States after living here for decades and they have never committed any of the crimes enumerated in Section 1226(c). By its plain text, therefore, Section 1226(a) applies to the Petitioners.

The Government argues however that Section 1226(a) cannot apply to Petitioners because the plain reading of Section 1226 conflicts with the text of Section 1225(b)(2)(A). We now turn to that section.

*ii. Section 1225*

The Government argues that Section 1225(b)(2)(A) applies to the Petitioners. The text of Section 1225(b)(2)(A) provides that "an applicant for admission" must be detained during removal proceedings "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted[.]" 8 U.S.C. § 1225(b)(2)(A). Detention under this subsection is mandatory and therefore such applicants are not given an opportunity for a bond hearing.[5]

[5] A noncitizen detained under this subsection can be released only through a mechanism known as "parole" for "urgent humanitarian reasons or significant public benefit," pursuant to 8 U.S.C. § 1182(d)(5)(A). Parole creates its own legal fiction. If a noncitizen is paroled, he is not considered to have been "admitted" into the United States, and he is treated "as if [he was] stopped at the border." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (quoting *Mezei*, 345 U.S. at 215).

By its terms, Section 1225(b)(2)(A) only applies where three conditions are met. The noncitizen must: 1) be an applicant for admission; 2) be seeking admission; and 3) not clearly and beyond a doubt be entitled to be admitted according to the examining immigration officer. The Petitioners do not contest that the first and third conditions apply. They contest only the second. They argue that they cannot be "seeking admission" because they entered the country thirty years ago. The Government, on the other hand, asserts that *all* applicants for admission are necessarily *seeking admission*. We discuss each condition below.

*Applicant for admission*. Section 1225(a)(1) provides that a noncitizen "present in the United States who has not been admitted or who arrives in the United States," "whether or not at a designated port of arrival," "shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1). The statute uses the phrase, "applicant for admission," to divide *all* noncitizens who come to the United States into two groups: those who have been lawfully admitted after inspection by an immigration officer, and those who have not been lawfully admitted. Under the plain text of the statute, the Petitioners are applicants for admission by virtue of being present in the United States without having been inspected and admitted by an immigration officer.[6]

*Clearly and beyond a doubt entitled to be admitted.* The Petitioners also concede that they are unable to establish that they are clearly and beyond a doubt entitled to be admitted. In fact, because they entered the country without inspection and admission by an

[6] The district court concluded incorrectly that the Petitioners were not applicants for admission.

immigration officer, the plain text of the statute tells us that the Petitioners are *inadmissible*. Section 1182(a) provides a list of noncitizens who are "inadmissible," and therefore "ineligible to receive visas and ineligible to be admitted to the United States," including noncitizens who are present in the United States without being admitted or paroled, or those who arrive in the United States at any location other than those designated by the Attorney General. 8 U.S.C. § 1182(a)(6)(A).

*Seeking admission*. The only dispute is the meaning of the phrase "seeking admission" in Section 1225(b)(2)(A). Recall that the relevant text reads:

> [I]n the case of an alien who is an *applicant for admission*, if the examining immigration officer determines that an *alien seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under [S]ection 1229a of this title.

8 U.S.C. § 1225(b)(2)(A) (emphasis added).

The Government's construction requires us to interpret "applicant for admission" and "alien seeking admission" as synonymous. Relying on the everyday meaning of the word, "applicant," and borrowing an analogy from the Fifth Circuit, the Government analogizes to a college applicant. *See Buenrostro-Mendez*, 166 F.4th at 502. Under the Government's analogy, a college applicant is applying to college and therefore is necessarily seeking admission to that college. Applying this analogy to the situation before us, the Petitioners must be seeking admission because they are applicants for admission.

The Petitioners argue that Section 1225(b)(2)(A) only applies to applicants for admission who are actively "seeking admission" by requesting lawful entry at the border. As the Petitioners cannot seek admission because they are already inside the country,

Section 1225(b)(2)(A) does not apply to them. Under this interpretation, an apt analogy would be to a moviegoer who sneaks into the theater without paying for a ticket and watches half the film. The moviegoer cannot be said to be "seeking" to enter the theater when he is already inside. Rather, he is requesting to remain.

This is where our sister circuits have split. It is worth spending a moment to tease out their disagreement over how properly to interpret the phrase "applicant for admission." Section 1225(a)(1) states that all noncitizens "present in the United States who ha[ve] not been admitted or who arrive[ ] in the United States," whether or not "at a designated port of arrival," "shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1).

The majority of courts have interpreted this phrase as a definitional provision, defining a statutory term of art: "applicant for admission." *See, e.g.*, *Barbosa da Cunha*, 175 F.4th at 75; *Lopez-Campos*, 175 F.4th at 722–23. Both the Government and the Petitioners urge us to adopt this interpretation as well.

"When Congress takes the trouble to define the term it uses," courts are obligated to use that definition rather than the ordinary meaning of the term of art wherever it appears in the text. *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 59 (2024). Conversely, where Congress does not define a term of art, we look to the "ordinary, contemporary, common meaning" of the word. *Othi v. Holder*, 734 F.3d 259, 265 (4th Cir. 2023) (quoting *United States v. Powell*, 680 F.3d 350, 355 (4th Cir. 2012)). Under this reading, Congress has separately defined the phrase, "applicant for admission," and the word, "admission." It did not define the word "seeking."

The Government argues that, even as a definitional provision, we should still give the ordinary meaning to the word, "applicant." As an applicant is ordinarily "seeking admission," so too must the Petitioners. If "applicant for admission" is indeed a definition, however, then we cannot separate out each word in the phrase to rely on their ordinary meanings. Under this reading, "applicant for admission" is comparable to a label. This is the approach taken by the First, Second, Third, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits.[7]

There is, however, a different way to read the phrase "applicant for admission," not as definitional provision but rather as a deeming provision. This is the approach of our dissenting colleague and the dissenting judges in the opinions of the Third, Sixth, and Eleventh Circuits.[8] This is not the approach taken by the Government or by the Fifth or Eighth Circuits. Legislatures sometimes use deeming provisions when "'it is necessary to establish a legal fiction' either by 'deeming something to be what it is not' or 'by deeming something not to be what it is." *Sturgeon v. Frost*, 587 U.S. 28, 47 (2019) (quoting Black's Law Dictionary 504 (10th ed. 2014)).

---

[7] *Guerrero Orellana*, 2026 WL 2352042, at *6–10; *Barbosa da Cunha*, 175 F.4th at 75–78; *Buele Morocho*, 2026 WL 2546223, at *3; *Hernandez Alvarez*, 175 F.4th at 1266–70; *Lopez-Campos*, 175 F.4th at 722–24; *Cirrus Rojas*, 183 F.4th at 918–22; *Rodriguez Vazquez*, 183 F.4th at 1173–1179; *Santillan Quiroz*, 180 F.4th at 1238–43; *see also Castañon-Nava*, 175 F.4th at 845–46 (Lee, J.).

[8] *Buele Morocho*, 2026 WL 2546223, at *15 (Mascott, J., dissenting); *Hernandez Alvarez*, 175 F.4th at 1288–91 (Lagoa, J., dissenting); *Lopez-Campos*, 175 F.4th at 740–42 (Murphy, J., dissenting).

We find merit to both interpretations. In contrast to the statutorily defined term "admission," the phrase "applicant for admission" is not included in the INA's definitional section. *Compare* 8 U.S.C. § 1101(a)(13) *with* 8 U.S.C. § 1225(a)(1). Moreover, when Congress defines a term of art, it generally uses words like "means" or "is" to signal that it is doing so. *United States v. Helton*, 944 F.3d 198, 206 n.5 (4th Cir. 2019); *see also Helvering v. Morgan's Inc.*, 293 U.S. 121, 125 n.1 (1934) ("The natural distinction would be that where 'means' is employed, the term and its definition are to be interchangeable equivalents[.]"). By contrast, Section 1225(a)(1) uses the word "deemed," suggesting that the intention was, in fact, to deem. The statute says that both noncitizens arriving in the United States and those present in the United States without being admitted "shall be *deemed*" applicants for admission. 8 U.S.C. § 1225(a)(1) (emphasis added). The title of Section 1225(a)(1), "Aliens *treated as* applicants for admission," also signals as much. *Id.* (emphasis added). Certainly, referring to noncitizens, like the Petitioners, who have lived in our country for decades and are not in fact applying for admission, as "applicants for admission" suggests the creation of a legal fiction, as one would expect a deeming provision to do.

Reading this phrase as a deeming provision does not square with the plain text, however. First, Section 1225(a)(1) does not just include people like the Petitioners who are not "applicants for admission," unless designated so by a legal fiction. Rather, the statute applies the label "applicant for admission" to *every* noncitizen who comes to the United States, many of whom are in fact presenting themselves for inspection at the border and requesting lawful entry (applying for admission) into the country. "There would be no need

for Congress to provide" that such noncitizens "be deemed" applicants for admission "if the former actually equated to the latter." *Hedin v. Thompson*, 355 F.3d 746, 749 (4th Cir. 2004). Because Section 1225(a)(1) includes both people who are, by the ordinary meaning of the phrase, applicants for admission as well as those who must be designated as such for purposes of the law, the phrase "applicants for admission" might be best understood as a term of art.

Second, while there is an inherent logic to treating deeming provisions and definitional provisions differently, this concept has not been developed as a canon of statutory interpretation. Despite the pervasiveness of legislatively created legal fictions, there exists no common approach that courts apply when interpreting deeming provisions, including the extent to which a legal fiction embodies every quality of the thing it is deemed to be. This is especially important because "seeking" remains undefined in the statute.

How expansively we should treat a deeming provision is a sticking point for the courts that have considered this question. Does being *deemed* an applicant for admission mean that an individual is also deemed to be *seeking* admission? Does being deemed an applicant for admission mean that an individual is also deemed to have *in fact* submitted an application for admission? Does it mean that a noncitizen is also deemed capable of *withdrawing* her application despite never having submitted one in the first place? If a noncitizen is not seeking admission, but *seeking something else* entirely, should she nonetheless also be deemed to be seeking admission? Our dissenting colleague, and the dissenting judges from the First, Third, Sixth, Seventh, Ninth, and Eleventh Circuits interpret this possible deeming provision expansively, imputing every characteristic of the

everyday plain meaning of "applicant for admission" to noncitizens like the Petitioners. *Guerrero Orellana*, 2026 WL 2352042, at *19 (Dunlap, J., dissenting); *Buele Morocho*, 2026 WL 2546223, at *15 (Mascott, J., dissenting) *Lopez-Campos*, 175 F.4th at 740–42 (Murphy, J., dissenting); *Cirrus Rojas*, 183 F.4th at 933 (Sykes, J., dissenting); *Rodriguez Vazquez*, 183 F.4th at 1194–96 (Bea, J., dissenting); *Hernandez Alvarez*, 175 F.4th at 1288–91 (Lagoa, J., dissenting). Tellingly, they cite no cases to support this approach. *But see Torres v. Barr*, 976 F.3d 918, 927 (9th Cir. 2020) (en banc) (rejecting the argument that an "applicant for admission" should be "deemed to have made an actual application for admission").

Throughout the United States Code, the word "deemed" is used in different ways. Sometimes, it creates a legal fiction. *See, e.g.*, *Sturgeon*, 587 U.S. at 47 (citing 16 U.S.C. § 3103(c)). Elsewhere, it defines a term of art. *See, e.g.*, *TC Heartland LLC v. Kraft Food Grps. Brand LLC*, 581 U.S. 258, 262 (2017) (citing 28 U.S.C. § 1391(c)). Even the INA itself uses the word "deemed" inconsistently. *See, e.g.*, 8 U.S.C. § 1101(a)(42) (providing that certain individuals "shall be *deemed* to have been persecuted on account of political opinion" (emphasis added)); 8 U.S.C. § 1103(a)(3) (permitting the Secretary of Homeland Security discretion to "perform such other acts as he *deems* necessary for carrying out his authority under the provisions of this chapter" (emphasis added)). Given the various competing uses of the word "deemed," it cannot do the work our dissenting colleagues suggest, altogether upending the historical practice and understanding of our nation's immigration laws.

Third, and significantly, even if Congress did intend to create a legal fiction by "deeming" the Petitioners to be "applicants for admission," it did not "deem" them to be "seeking admission," "applying for admission," or to have "submitted an application for admission." Each of these phrases appears elsewhere in the statute. Standing alone and unmodified, "applicants for admission" plainly applies to the Petitioners because they are present in the United States without inspection and authorization. Section 1225(b)(2)(A), however, modifies the phrase "applicant for admission" by adding the additional phrase, "seeking admission."

That modification is important, and this court's precedent in *Hedin v. Thompson* illustrates why. *Hedin* concerned the proper construction of the Health Professions Education Partnerships Act. 355 F.3d at 748. One section of that statute provided that "[a]ctive service" in the Commissioned Corps of the United States Public Health Service "shall be deemed to be active military service in the Armed Forces of the United States for purposes of all laws related to discrimination on the basis of race, color, sex, ethnicity, age, religion, and disability." *Id.* (quoting 42 U.S.C. § 213(f)). This deeming provision created a legal fiction whereby someone who was not serving in the military was nonetheless "deemed to be" serving in the military for the narrow purpose articulated by Congress. *Id.* at 748–49. Where the phrase "active service" stood alone and unmodified, *Hedin* treated it as a deeming provision that included individuals serving in the Public Health Service. *Id.* at 749. Here too, where "applicants for admission" is unmodified, the phrase includes noncitizens like the Petitioners who are present without inspection and admission. *See, e.g.*, 8 U.S.C. § 1229a.

Not all references to "active service" in the Health Professions Education Partnerships Act, however, refer to those in the Public Health Service. In interpreting the statute, the *Hedin* court noted that, where the statute sought to "address[ ] a certain kind of 'active service,' including military-type service, it expressly modifies the term 'active service' to indicate this limitation." 355 F.3d at 749. For example, where the statute provides for "active service *in time of war*," the deeming provision does not apply. *Id.* (quoting 42 U.S.C. § 213(a)). Nor does the legal fiction expand to encompass qualities of traditional military service. Where, for instance, "active service" is modified to add "in such grade or any higher grade in the Reserve Corps," the legal fiction does not extend to members of the Public Health Service. *Id.* (quoting 42 U.S.C. § 211(j)(2)). Similarly, the phrase "applicant for admission" in Section 1225(b)(2)(A) is modified to add "seeking admission." Applying the reasoning of *Hedin*, even if we were to accept that the phrase is a deeming provision, it would not follow that the Petitioners are seeking admission.

Thus, though Section 1226(a) unambiguously applies to the Petitioners, we are confronted with two layers of ambiguity in Section 1225(b)(2)(A). First, whether the phrase, "applicant for admission," is a definitional or deeming provision. Second, assuming it is a deeming provision, the impact of the modifying phrase, "seeking admission." The Government asks us to read "an alien seeking admission" as synonymous with "applicant for admission." The Petitioners counter that "seeking admission" must be read to apply

only to a subset of applicants for admission, those who take affirmative steps towards lawful entry. Both readings are plausible based upon the plain text.[9]

To resolve this ambiguity, we must turn to customary interpretive tools to determine the best reading of the text. First, we consider the canons of surplusage and meaningful variation, which direct courts to consider which interpretation of the statute gives most effect to the words chosen by Congress. Second, we look to the statute as a whole to situate the isolated provisions in the broader context of the law. Third, we consider the statutory and legislative history of the INA and IIRIRA. Fourth, we discuss the longstanding, universal interpretation of the statutes. Fifth, we apply what is known as the elephants-in-mouseholes canon, whereby courts decline to read sweeping mandates into ambiguous language. Finally, we consider the principles of constitutional avoidance, which require courts to interpret statutes to avoid unnecessarily implicating constitutional issues.

---

[9] The Government argues that two other provisions of the statute, Sections 1225(a)(3) and 1225(a)(5), overcome this ambiguity. We disagree.

Section 1225(a)(3) requires immigration officers to inspect "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission." 8 U.S.C. § 1225(a)(3). The Government argues "or otherwise" establishes that all applicants for admission are seeking admission. As our colleagues at the Second Circuit have explained, however, "or otherwise" does not always create a subset relationship. *Barbosa da Cunha*, 175 F.4th at 78–79 (citing *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 586 U.S. 123, 125 (2019) (rejecting the same argument proffered by the Government in the context of a different statute, 35 U.S.C. § 102(a)(1))). "Or otherwise" is context-dependent and does not cure the ambiguity of this statute.

Section 1225(a)(5) provides that "[a]n applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States." 8 U.S.C. §1225(a)(5). As our colleagues in the Tenth Circuit aptly noted, "[a]ll that subsection (a)(5) demonstrates is that applicants for admission *can* be seeking admission, not that they must be." *Santillan Quiroz*, 180 F.4th at 1245.

These canons of statutory interpretation all lead to the same conclusion: Section 1226 governs the detention of noncitizens like the Petitioners.

## B. <u>Giving Effect to Each Word</u>

It is a "cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). This canon is known as the canon against surplusage. It requires us to construe a statute "so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). Though this canon is not "an iron rule," *Mullin v. Al Otro Lado*, 609 U.S. ---, 146 S. Ct. 2079, 2092 (2026), where, as here, there are multiple possible interpretations of a statute and one would avoid creating surplusage, the canon is "strongest." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013).

The Government's interpretation of Section 1225(b)(2)(A) collapses two distinct phrases, "applicant for admission" and "seeking admission," into one. If that construction were to hold water—that an applicant for admission is necessarily seeking admission—there would no reason to include the phrase "seeking admission." It would be pure surplusage. Had Congress not included that phrase, then the plain text of Section 1225(b)(2)(A) would support the Government's position. The provision would read as follows: Mandatory detention is required in the case of any "applicant for admission, if the examining immigration officer determines that [the] alien ~~seeking admission~~ is not clearly

and beyond a doubt entitled to be admitted." This is not what the statute says, however. The flaw in the Government's construction is thus evident; it requires us to write an entire phrase—seeking admission—out of the sentence. *See United States v. Taylor*, 596 U.S. 845, 857 (2022) ("[W]e do not lightly assume Congress adopts two separate clauses in the same law to perform the same work.").

The Petitioners' reading, by contrast, gives meaning to each word in Section 1225(b)(2)(A). This corresponds with another commonly applied canon of statutory construction: the meaningful variation canon. Generally, where Congress uses different terms, it "suggests a variation in meaning." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012). Where a statute employs "one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea." *Valladares*, 130 F.4th at 82 (quoting *S.W. Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2012)). Applying this canon, an "applicant for admission" is not necessarily "seeking admission." Under the Petitioners' reading, "seeking admission" describes the active and ongoing conduct of certain applicants for admission: those physically attempting to come into the United States, typically at a border or port of entry, and presenting themselves for inspection and authorization to lawfully enter.[10] While

[10] Like the Tenth Circuit, we do not interpret "seeking admission" to be "limited to the literal moments that a noncitizen is filling out a form or speaking with an immigration official to request admission. . . . It is enough that some pending request for admission remains open or ongoing because it indicates the process of securing admission is still active." *Santillan Quiroz*, 180 F.4th at 1239.

the Petitioners are applicants for admission, they have been living in the United States for decades and are not presently seeking admission under this reading.

Beyond merely writing words out of Section 1225(b)(2)(A), the Government's reading that Section 1226(a) does not apply also renders entire portions of Section 1226(c) "void" or, at the very least, "insignificant." *Corley*, 556 U.S. at 314; *see also Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010). When IIRIRA was enacted, Congress explicitly carved out four groups of noncitizens under Section 1226(c). While these noncitizens would otherwise be subject to discretionary detention under Section 1226(a), the statute requires that they be mandatorily detained pending removal proceedings. Two of these groups include noncitizens lawfully admitted into the United States but now "deportable" because they committed certain crimes. *See* 8 U.S.C. § 1226(c)(1)(B)–(C). The other two groups include those who have not been lawfully admitted into the United States and are now "inadmissible" because they committed certain crimes. *See* 8 U.S.C. § 1226(c)(1)(A), (D). Section 1226(c) is recognized as "a limit on the authority conferred by subsection (a)" of Section 1226, the very statute the Government would have us find does not apply here. *Nielsen v. Preap*, 586 U.S. 392, 409 (2019). As we have explained, these carveouts are strong evidence that Section 1226(a) applies to both noncitizens who have been admitted but are now deportable and to those who are present in the United States without being inspected and authorized who are inadmissible, like Petitioners. If all applicants for admission were already subject to mandatory detention, then these carveouts would be largely unnecessary.

The recent passage of the Laken Riley Act further confirms this interpretation. Congress enacted the Laken Riley Act in January 2025, a mere six months before the Government announced its new construction of the INA. When Congress amends a statute, "we presume it intends its amendments to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995). The Laken Riley Act amended parts of both Sections 1226 and 1225. *See* Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025). Relevant here, Congress amended Section 1226(c) to mandate the detention of noncitizens who are "inadmissible" because they are present in the United States without admission and have committed or are suspected of committing certain crimes. *See* 8 U.S.C. § 1226(c)(1)(E). Under the Government's interpretation, these noncitizens would already have been subject to mandatory detention under Section 1225(b)(2)(A). The Laken Riley Act amendment would therefore have no effect.

The Government proffers two responses.

First, the Government argues that the Laken Riley Act amendment to Section 1226 was intended to remove the option of parole for those already mandatorily detained under Section 1225. This interpretation lacks basis in the text of the statute. Section 1226(c)(1)(E) does not mention parole. Nor does Section 1226(c) eliminate the possibility of release. Section 1226(c)(4) explicitly permits the Attorney General to release noncitizens that are mandatorily detained under Section 1226(c) under certain circumstances, including where the Attorney General determines that the noncitizen poses no danger to the community or risk of flight. 8 U.S.C. § 1226(c)(4).

Had Congress intended only to eliminate the availability of parole for those already mandatorily detained under Section 1225, it would have either done so through an amendment to that section of the statute, or by adding an additional exception to those already enumerated in 8 U.S.C. § 1182(d)(5), which governs parole. Further undermining the Government's argument, Congress did in fact amend Section 1225(b) when it passed the Laken Riley Act to permit state attorneys general to sue the Secretary of Homeland Security to enforce the act. *Id.* § 1225(b)(3). Yet, Congress did not address mandatory detention for noncitizens who are present in the country unlawfully in that subsection.

Second, the Government asserts that Congress included the Laken Riley Act's Section 1226 amendment because, at the time, the Executive Branch was improperly providing noncitizens like the Petitioners with bond hearings rather than mandatorily detaining them. This argument exposes the flaws in the Government's position, however. If Congress sought to correct the Executive Branch's misunderstanding, it surely would have done so in a more explicit manner. In interpreting statutes, "Congress'[s] failure to repeal or revise [the statute] in the face of such administrative interpretation [is] persuasive evidence that that interpretation is the one intended by Congress." *CBS, Inc. v. FCC*, 453 U.S. 367, 385 (1981) (quoting *Zemel v. Rusk*, 381 U.S. 1, 11 (1965)). Far from informing the Executive Branch that it was acting in defiance of legislative command, the passage of the Laken Riley Act affirms the longstanding practice of detaining noncitizens like the Petitioners under Section 1226.

The canons of surplusage and meaningful variation, therefore, counsel that Section 1226 is the best reading of the statute.

### C. Construing the Statute as a Whole

Another pillar of statutory interpretation is that courts must "construe statutes, not isolated provisions." *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995)). The Government's one-size-fits-all approach to "applicants for admission" makes little sense when viewing the statute as a whole. The statute does not equate the phrase "applicant for admission" with "seeking admission." Rather, it delineates between those applicants for admission who are—or should be regarded as—seeking admission and those who are not.

First, while noncitizens can apply for admission, the statute also provides for noncitizens to apply for a host of other forms of relief and status that allow a noncitizen to come to or remain in the United States even if they have not or cannot be admitted. Second, read together, Sections 1225 and 1226 create a graduated, risk-dependent approach to the detention of noncitizens. Reading the statute as a whole confirms that the Petitioners are not seeking admission, but other forms of lawful relief, and fall properly within Section 1226(a).

#### *i. Seeking what?*

The statute distinguishes between noncitizens who are seeking admission and those seeking to enter or remain in the country through another mechanism. Applicants for admission can be—and indeed, most often are—applying for legal status or relief other than "admission" as defined by the statute.

Though it seems counterintuitive, "admission" to the United States and lawful presence in the United States are not the same. Take the example of a stowaway, a noncitizen who has traveled on a boat or plane without a ticket and arrives in the United States. Under the statute, a stowaway cannot be "considered an applicant for admission" and is "not eligible to apply for admission." 8 U.S.C. § 1225(a)(2). A stowaway can, however, "apply for asylum" if she has a "credible fear of persecution[.]" *Id.* A stowaway may thus gain lawful presence in the United States if granted asylum but cannot be admitted.

Noncitizens can also apply for "relief or protection from removal." *Id.* § 1229a(c)(4). They can, for example, apply for Temporary Protected Status (TPS) to protect themselves from removal if their country of origin has been specifically designated as one facing a particularly dire situation, usually an ongoing conflict, natural disaster, or other extraordinary condition. *Id.* § 1254a. Similarly, Deferred Action for Childhood Arrivals (DACA) is a program that provides protection against removal for certain noncitizens who arrived in the United States as children. Cancellation of removal and adjustment of status are available to noncitizens who have lived in this country without lawful status for decades so long as they are "of good moral character" and their removal would result in hardship. *Id.* § 1229b(b)(1). Adjustment of status is also available under the Violence Against Women Act (VAWA) to noncitizens who crossed the border unlawfully and were subsequently subjected to "extreme cruelty by a spouse or parent who is or was a United States citizen." *Id.* § 1229b(b)(2)(A)(i)(I).

Lawful status and admission are thus "distinct concepts in immigration law." *Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021). A noncitizen can gain lawful status or the ability to remain in the United States without being "admitted" as that word is defined by the statute. It is these forms of relief, not admission, that the Petitioners seek.

*ii. Detention categories*

The Government argues that adopting the Petitioners' interpretation creates difficult line-drawing questions as to when a noncitizen falls within Section 1225 rather than within Section 1226. Reading the statute as a whole makes clear that Congress already drew those lines when it created four categories to govern the detention of applicants for admission during removal proceedings. In doing so, Congress largely reincorporated the structure of pre-IIRIRA statutes and explicitly stated where it deviated from these predecessor statutes. Though three of these categories plainly include noncitizens, like the Petitioners, who are present in the country without authorization, the phrase "seeking admission" does not appear in any of them. We discuss each category below.

*Noncitizens subject to expedited removal.* First, Congress created a process known as expedited removal. 8 U.S.C. § 1225(b)(1). Expedited removal allows immigration officers to inspect and remove a subset of noncitizens quickly without the extensive procedures generally provided in removal proceedings. *Id.* Expedited removal applies to two groups of noncitizens. First, it covers noncitizens arriving in the United States who are inadmissible. *Id.* § 1225(b)(1)(A)(i). Second, the Attorney General has discretion to designate for expedited removal noncitizens who have "not been admitted or paroled into the United States" and who have not "affirmatively shown" that they have "been physically

present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility[.]" *Id.* § 1225(b)(1)(A)(iii).

Expedited removal, therefore, applies only to certain inadmissible noncitizens arriving in the United States or noncitizens who recently crossed the border without inspection. Given the abbreviated procedures it provides, expedited removal "operates on a short timeline. Decisions and removals often occur within days, and sometimes sooner." *Make the Road New York v. Mullin*, 179 F.4th 16, 22 (D.C. Cir. 2026). Noncitizens subject to expedited removal are mandatorily detained without the possibility of bond pending their removal proceedings. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). These noncitizens are inadmissible and can only apply for asylum. *Id.* § 1225(b)(1)(A)(i). Though this subsection plainly applies to applicants for admission who have crossed the border unlawfully, the section does not suggest that these applicants are "seeking admission."

*Arriving noncitizens seeking admission.* Second, Congress provided that all other noncitizens arriving in this country and seeking lawful entry are subject to Section 1225(b)(2). Like those subject to Section 1225(b)(1), these noncitizens recently arrived in the United States but have not demonstrated that they are "entitled to be admitted." 8 U.S.C. §1225(b)(2)(A). Because they are actively seeking lawful entry, unlike the applicants for admission covered in Section 1225(b)(1)(A)(iii), these noncitizens are granted the full benefits of normal removal proceedings under Section 1229a (as opposed to expedited removal proceedings). *Id.* § 1225(b)(2)(A). Noncitizens in this category are subject to mandatory detention. *Id.* These applicants can legally seek admission, asylum, and other legal statuses during their removal proceedings. This is the only category of the four

enumerated by Congress that explicitly applies to noncitizens who are "seeking admission." *Id.*

As we have explained, where Congress intended to create a legal fiction that an applicant for admission who crossed the border without inspection and authorization should nonetheless be regarded as "seeking admission," it did so explicitly. Take for example, a lawful permanent resident who left the United States on a trip to Mexico. Instead of crossing at a port of entry upon his return, the lawful permanent resident decided to skip the lines and cross by foot back into the United States. A lawful permanent resident who is present in the United States without inspection and authorization is deemed an applicant for admission. *See* 8 U.S.C. § 1225(a)(1). In our example, the lawful permanent resident clearly is not "seeking lawful entry." He snuck back into the United States. He is then apprehended just a few miles after crossing the border. Under the plain text of the statute, he would be subject to Section 1225(b)(2)(A)'s expedited removal proceedings.

The statute, however, instructs us to treat this lawful permanent resident differently than other noncitizens who cross the border unlawfully. Though the lawful permanent resident crossed the border unlawfully without authorization, the statute tells us to "regard[ ]" him as "seeking an admission." 8 U.S.C. § 1101(a)(13)(C)(vi). This subsection is instructive. It demonstrates that where Congress intends to create a legal fiction that an applicant for admission who has crossed the border unlawfully is "seeking admission," it does so explicitly. By contrast, the statute does not state that applicants for admission, like the Petitioner, who have crossed the border unlawfully should be regarded as "seeking admission."

*Noncitizens apprehended and detained in the United States.* This brings us to the third category: noncitizens subject to Section 1226(a). As we have discussed, Section 1226(a) applies to noncitizens apprehended and detained in the country. *Supra* Section III.A.i. By its plain language, the statute applies to both noncitizens lawfully admitted into the United States but now deportable as well as noncitizens present in the United States without authorization, like the Petitioners. 8 U.S.C. §1226(a). This section carries forward the pre-IIRIRA discretionary detention framework for both groups of noncitizens. Both groups are subject to regular removal proceedings.

Those noncitizens who are present without inspection and authorization, like the Petitioners, cannot seek admission during the removal proceedings. They are "inadmissible" because they entered the United States without seeking lawful entry. They can, however, seek asylum and other forms of relief to remain in the country. During the pendency of their proceedings, these noncitizens are subject to discretionary detention. *Id.* Discretionary detention recognizes that these noncitizens are more likely to have extensive ties to the United States and their potential risk level can more readily be assessed. Again, though its plain language applies to applicants for admission like the Petitioners, this section also does not include any reference to "seeking admission."

*Noncitizens apprehended in the United States who have committed certain crimes.* Finally, in the fourth category, Congress created certain exceptions to discretionary detention under Section 1226(c). By its plain language, this section also applies to certain noncitizens who are present without inspection and authorization. *See* 8 U.S.C. § 1226(c)(1)(A), (D), (E). These applicants for admission cannot be released on bond

during the pendency of their removal proceedings. Instead, they are mandatorily detained under Section 1226(c) because they committed certain crimes. *Id.* § 1226(c). Once more, this section does not use the phrase, "seeking admission," in reference to these applicants for admission.

Viewing the statute through this broader lens, Congress thus created a graduated framework, taking into consideration the noncitizens' risk and ties to their communities, to govern detention pending removal proceedings. The Petitioners have been present in the United States for decades without being admitted or paroled and are therefore not subject to Section 1225(b)(1)(A). They are not, in fact, seeking admission nor has the statute deemed them to be doing so, and are therefore not subject to Section 1225(b)(2)(A). Nor have they committed any criminal acts, and therefore are not subject to Section 1226(c). Rather, given their extensive ties and lack of risk to their communities, the Petitioners are subject to Section 1226(a) and therefore must be provided a bond hearing.

### D. <u>Statutory and Legislative History</u>

The Government rests much of its argument on legislative history. In attempting to overcome the best reading of the statute, the Government extrapolates from a single sentence in the thousands of pages of legislative history that one purpose of IIRIRA was to "replace certain aspects" of the prior statutory framework that afforded those unlawfully present in the United States with "equities and privileges in immigration proceedings that are not available to [noncitizens] who present themselves for inspection at a port of entry." *See* H.R. Rep. No. 104-469, pt. 1, at 225 (1996). The Government argues that a narrow

reading of "seeking admission" would defeat Congress's purpose when it labeled individuals like the Petitioners applicants for admission and would create perverse incentives to reward noncitizens who enter the country unlawfully. Not so.

As a threshold matter, "[w]e cannot replace the actual text with speculation as to Congress'[s] intent." *Magwood v. Patterson*, 561 U.S. 320, 334 (2010). The Government is correct that, in enacting IIRIRA, Congress altered certain aspects of the historical distinction between these two groups. As we have explained, Congress grouped noncitizens already present inside the United States without admission and those arriving at the border together under the same label: applicant for admission. 8 U.S.C. § 1225(a)(1). Congress created the process of expedited removal for a subset of these noncitizens. 8 U.S.C. § 1225(b)(1)(A)(iii). Congress also replaced the prior dual-track scheme of deportation and exclusionary proceedings with a single procedure for removal. *See* 8 U.S.C. § 1229a. Congress established respective burdens of proof for applicants for admission subject to removal based on inadmissibility and noncitizens who are subject to removal based on deportability, providing for the same burden to apply to individuals present in the country without authorization and those just arriving. 8 U.S.C. §1229a(c)(2).

IIRIRA therefore made significant moves toward equalizing the treatment of noncitizens present in the country unlawfully and those who have just arrived. There is, however, nothing in the statutory text, structure, or history of IIRIRA to suggest that Congress intended, as the Government asserts, to eliminate every distinction between these groups. There is, rather, plenty of proof to the contrary. In fact, the same part of the legislative history cited by the Government states that Congress sought only to alter

"*certain* aspects" of this differential treatment. H.R. Rep. No. 104-469, pt. 1, at 225 (emphasis added).

With respect to the detention statutes specifically, the legislative history indicates that Congress intended to maintain the prior distinctions. The legislative history report cited by the Government emphasizes that Section 1226 "restates" the pre-IIRIRA Section 1252(a)(1) "regarding the authority of the Attorney General to arrest, detain, and release on bond [a noncitizen] who is not lawfully in the United States." H.R. Rep. No. 104-469, pt. 1, at 229. The predecessor statute to Section 1226 provided for a bond hearing for noncitizens present in the United States without inspection and authorization. 8 U.S.C. § 1252(a)(1) (1995). The legislative history makes no mention of narrowing bond eligibility for such noncitizens.

Moreover, the legislative changes enacted in IIRIRA indicate that Congress intended to broaden the scope of the bond eligibility provisions to continue to apply to the same noncitizens it had applied to historically. "When Congress amends legislation, [we] presume it intends the change to have real and substantial effect." *Van Buren v. United States*, 593 U.S. 374, 393 (2021) (quoting *Ross v. Blake*, 578 U.S. 632, 641–42 (2016)). The predecessor statute to Section 1226 used the phrase "[p]ending a determination of deportability" consistent with the prior statute's dual-track framework for deportation and exclusionary proceedings. *See* 8 U.S.C. § 1252(a)(1) (1995). In IIRIRA, Congress explicitly removed the word "deportability," replacing it with the word, "removed." 8 U.S.C. § 1226(a). The use of "removed" broadens the section to encompass IIRIRA's newly defined categories of both inadmissible and deportable noncitizens. With this

change, Congress ensured that this same procedure continues to apply to noncitizens like the Petitioners.

The statutory and legislative history of IIRIRA also reflects Congress's purpose in enacting Section 1225(b). The House Report on IIRIRA describes Section 1225(b) as "establish[ing] new procedures for the inspection and in some cases removal of aliens arriving in the United States." H.R. Rep. No. 104-828, at 209 (1996). Section 1225(b) also traces its roots to prior statutory provisions. The Immigration Act of 1893 states, "it shall be the duty of every inspector of arriving alien immigrants to detain for a special inquiry . . . every person who may not appear to him to be clearly and beyond doubt entitled to admission." 27 Stat. 569, 570. The language of this predecessor statute echoes in the formulation of Section 1225(b)(2)(A): "[I]f the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a [removal] proceeding[.]" Seeking admission is not surplusage. Rather, it is an essential phrase that limits the application of the subsection to noncitizens at the border.

Though the Government's argument rests heavily on legislative history, we disagree that the legislative history tips in the Government's favor. Rather, the statutory and legislative history both demonstrate that Congress intended for "seeking admission" to have a meaning different from and in addition to "applicant for admission." Seeking admission is a modifier indicating an additional element that must be met, not a characteristic imputed to every applicant for admission.

E. Longstanding Interpretation

The universal, longstanding interpretation of the detention statutes at issue also confirms that Section 1226(a) governs the detention of the Petitioners. "[T]he longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is." *Loper Bright Enters.*, 603 U.S. at 386.

Since the passage of IIRIRA in 1996, 8 U.S.C. § 1226(a) has been universally understood to govern the detention of noncitizens, like Lopez Garcia and Rivera, who are already in the country, regardless of whether they entered the country lawfully. By contrast, 8 U.S.C. § 1225(b)(2)(A), which does not allow for a bond hearing in advance of removal, has been understood to govern the detention of noncitizens "seeking admission into the country" at the border. *Jennings*, 583 U.S. at 289. Thus, absent certain exceptions, it was always the case prior to July 2025 that whether a noncitizen would receive a bond hearing or be subject to mandatory detention turned on whether the noncitizen was already in the country or was seeking to enter at the border.

For three decades, the Executive Branch interpreted the statute in a manner that is contrary to its current position. *See* 8 C.F.R. §§ 1003.19(a) & (h)(2), 1236.1(d); 62 Fed. Reg. 10323. Previously when it has detained noncitizens present in the United States without authorization, it has universally done so under Section 1226. The Executive Branch's longstanding practice is particularly significant "when [it] was issued roughly contemporaneously with the enactment of the statute and remained consistent over time." *Loper Bright*, 603 U.S. at 386. In 1997, the Executive Branch promulgated a federal regulation implementing these statutes. Implementing Immigration Statutes, 62 Fed. Reg.

10312, 10323 (Mar. 6, 1997). During the rulemaking process, the Executive Branch explained that "aliens who are present without having been admitted or paroled," like the Petitioners, "will be eligible" for bond under Section 1226. *Id.*

Five presidential administrations, including the first Trump Administration, acted in accordance with this interpretation of the statute. This too provides weighty evidence in support of the Petitioners' position that their detention should be subject to Section 1226(a) and, therefore, they should be provided a bond hearing.

### F. Elephants in Mouseholes

Lest we not lose the forest for the proverbial statutory trees, it is important to state the real-world implications of the Government's argument. Accepting the Government's construction would mean that Congress mandated the detention of millions of people and upended the longstanding distinction, grounded in the Due Process Clause of the Constitution, between those arriving at our borders and those already present in our country. Yet no one took notice for three decades. It is axiomatic that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 468 (2001). Congress "does not, one might say, hide elephants in mouseholes." *Id.* As we have shown, the statute is riddled with ambiguity. We can safely assume that Congress would not have enacted such an historically unprecedented change without greater clarity.

Nestled in the ambiguity in Section 1225, the Government asserts that Congress transformed our nation's immigration detention system. Before June 2025, it was

well-established that noncitizens who have "passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Mezei*, 345 U.S. at 212. These principles have been reaffirmed by the Supreme Court after the enactment of IIRIRA. When a noncitizen enters the country, "the legal circumstances change[ ] . . . whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693.

This history and tradition notwithstanding, the Government contends that Congress summarily did away with these procedural safeguards for millions of people without so much as a passing reference. Had Congress truly intended to extinguish every difference between noncitizens arriving at the border and those present in the country without authorization, we would expect more than simple statutory silence. *See Learning Res., Inc.*, 607 U.S. at 242–47.

The Government concedes that in 1996, the year IIRIRA was enacted, approximately two million people would have been newly subject to mandatory detention under its construction of the statute. That number today is estimated to be six million. Under the Government's new statutory construction, then, we are being urged to hold that Congress authorized the detention without bond of millions of people and did so without so much as a mention of the logistical difficulties—or moral implications—of such a massive undertaking.

Congress's silence with respect to this purported detention mandate contrasts sharply with its well-articulated concerns about IIRIRA's more modest expansion of mandatory detention under Section 1226(c). Congress anticipated that Section 1226(c)

could result in the mandatory detention of an additional 45,000 noncitizens in any given year. H.R. Rep. No. 104–469, pt. 1, at 118, 120, 123. Congress expressed concern that such an increase would place significant strain on existing detention resources and therefore provided for delayed implementation to allow time to scale up the nation's detention resources. *See* Pub. L. No. 104-208, § 303(b)(2), 110 Stat. 3009, 586–87 (1996). Faced with the practical realities of a sudden increase in the number of noncitizens detained, the Executive Branch did, in fact, delay implementation of the Section 1226(c) detention provisions for two years. *See* Margaret H. Taylor, *The 1996 Immigration Act: Detention and Related Issues*, 74 Interpreter Releases 209, 216–17 (1997). Congress's silence, particularly when coupled with its express concern about the impact of mandatory detention on a considerably smaller scale, speaks volumes. It is difficult to imagine a larger proverbial elephant.

Yet, somehow, this elephant escaped the notice of all three branches of our federal government for decades. While past practice does not justify disregard of clear statutory language, *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015), there is no clear language to disregard here. The longstanding, universal interpretation and application of this statutory language also counsels against crediting the Government's newfound construction. *See Monsalvo v. Bondi*, 604 U.S. 712, 728 (2025) (explaining that IIRIRA "should be read in light of the government's longstanding regulatory practice"). "When an agency claims to discover in a long-extant statute an unheralded power," we "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573

U.S. 302, 324 (2014). The actions of fifteen Congresses, the Supreme Court, and five presidential administrations for thirty years confirm that no such elephant exists.

G. Constitutional Avoidance

Our examination of the text of the statute also cannot ignore the grave constitutional implications of the Government's construction. The Government urges us to adopt a construction of an ambiguous statute that would subject millions of people living and working in the United States to mandatory detention with no recourse to the constitutional protections that have long been held to apply to them. Where an "otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,'" courts are "obligated to construe the statute to avoid such problems." *INS v. St. Cyr*, 533 U.S. 289, 299–300 (2001) (citation omitted); *see also Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–49 (1936).

The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process Clause] protects." *Zadvydas*, 533 U.S. at 690; *see also Demore v. Kim*, 538 U.S. 510, 531 (2003). While detention during removal proceedings "is a constitutionally permissible part of that process," the government's "ability to detain noncitizens is not limitless." *Lopez-Campos*, 175 F.4th at 732. As we have explained, our immigration laws have always distinguished between noncitizens "on the threshold of initial entry" and those who have "passed through our gates." *Mezei*, 345

U.S. at 212. It is also foundational to our immigration laws that the Fifth Amendment protects the due process rights of those present in the United States *regardless* of whether they entered lawfully. *See, e.g.*, *Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903); *Reno v. Flores*, 507 U.S. 292, 306 (1993).

This is a textbook case for constitutional avoidance. The Government's novel construction would implicate the constitutional due process rights of millions of noncitizens in our country, many of whom have lived, worked, and become integral parts of their communities, for years. The district court's interpretation is not only fairly possible; it has been the universal interpretation of the statute for decades.

To the extent that Section 1225(b)(2)(A) is ambiguous, the canons of statutory interpretation all point to the same conclusion: Section 1226(a) properly governs the detention of noncitizens like the Petitioners who are present in the United States, regardless of how they came to be in our country.

## IV. Conclusion

Mass detention of marginalized individuals without due process harkens back to some of the darkest moments in our country's history. In 1892, Congress enacted the Geary Act, which called for the mandatory detention of and "hard labor" for Chinese persons who were "adjudged to be not lawfully entitled to be or remain in the United States[.]" Geary Act, 27 Stat. 25, § 4. Thousands of Chinese persons were unconstitutionally detained under this Act in violation of their due process rights. *See Wong Wing v. United States*, 163 U.S. 228, 232–35 (1896). Fifty years later, with racial animus masquerading as national interest,

the government ordered the mass detention of all individuals of Japanese descent present in the United States during World War II. Nearly 120,000 people were sent to internment camps within our borders. *United States v. Hohri*, 482 U.S. 64, 66 (1987).

The stain of these detentions on our nation—and the judiciary's abdication of its obligation to protect basic freedoms—continues to haunt us. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 710 (2018) (stating that the Supreme Court decision affirming executive policies on Japanese internment "was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution'" (internal quotation marks omitted)). Those shameful and abhorrent past detentions were limited in scope in comparison to the mandatory detention that the Government urges us today to find that Congress established thirty years ago in an ambiguously worded statutory provision. We decline to do so.

For the reasons set forth above, we affirm the district court's grants of habeas relief. Section 1226 properly governs the detention of the Petitioners. Oscar Enrique Lopez Garcia and Juan Jose Rivera could not be detained pending the outcome of their removal proceedings without the opportunity to argue for their release at a bond hearing.

*AFFIRMED*

RUSHING, Circuit Judge, dissenting:

This appeal presents a question of statutory interpretation: Does 8 U.S.C. § 1225(b)(2)(A), which requires the Department of Homeland Security (DHS) to detain certain aliens for removal proceedings, apply to aliens who are present in the United States without having been lawfully admitted? The decision *whether* to mandate detention pending removal lies with Congress. "Our role" is simply "to interpret the language of the statute" that Congress enacted. *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461 (2002). That means considering the "statutory text, context, and history." *Musacchio v. United States*, 577 U.S. 237, 246 (2016). Those considerations establish that Section 1225(b)(2)(A) requires DHS to detain aliens who are present in the country without having been lawfully admitted—like Petitioners—during their removal proceedings. Because the majority holds otherwise, I respectfully dissent.[1]

**A. Statutory Text**

"As always, we start with the text." *Campos-Chaves v. Garland*, 144 S. Ct. 1637, 1647 (2024). When interpreting a statute, we "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (internal quotation marks omitted). "[W]ords generally should be interpreted

[1] Binding precedent from the Supreme Court and this Court holds that 8 U.S.C. § 1252(b)(9) does not deprive us of jurisdiction to decide legal challenges to immigration detention procedures. *See Jennings v. Rodriguez*, 583 U.S. 281, 292–295 (2018) (plurality); *id.* at 876 (Breyer, J., dissenting); *Miranda v. Garland*, 34 F.4th 338, 353 n.6 (4th Cir. 2022). *But see Jennings*, 583 U.S. at 315–326 (Thomas, J., concurring). Accordingly, I address the merits.

as taking their ordinary, contemporary, common meaning at the time Congress enacted the statute." *Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018) (internal quotation marks and ellipsis omitted). Of course, when Congress defines a statutory term, "we must follow that definition, even if it varies from a term's ordinary meaning." *Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) (internal quotation marks omitted).

**1. Text of Section 1225(b)(2)(A)**

Section 1225(b)(2)(A) reads in full:

> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(A). The operative clause of the sentence dictates that "the alien shall be detained" for a removal proceeding "if" one condition is satisfied: "the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted." *Id.* Two prefatory clauses modify the operative clause. The first carves out the exceptions in subparagraphs (B) and (C) of Section 1225(b)(2), which do not apply here. The second identifies who this provision concerns: "an alien who is an applicant for admission." *Id.*

Petitioners concede they are "applicant[s] for admission," but dispute that they are "alien[s] seeking admission." So we must determine the meaning of those phrases. The INA defines "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). It defines "admission" to mean "with respect to an alien, the lawful entry of

the alien into the United States after inspection and authorization by an immigration officer." *Id.* § 1101(a)(13)(A). The INA does not define "applicant" or "seeking," so we give those words their ordinary meaning. An "applicant" is "a person who applies," and "apply" means "to make a formal request." Webster's New World College Dictionary 67 (3d ed. 1988); *see* Merriam Webster's Collegiate Dictionary 56–57 (10th ed. 1993) (defining "applicant" as "one who applies," and "apply" as "to make an appeal or request"). "Seek" means "to request; ask for." Webster's New World College Dictionary 1215; *see* Merriam Webster's Collegiate Dictionary 1057 (defining "seek" as "to ask for: REQUEST"). So an "applicant" is a person who requests, and "seeking" is requesting. *See also* The American Heritage Dictionary of the English Language 89 (3d ed. 1992) ("apply" means "[t]o request or *seek* assistance, employment, or admission" (emphasis added)).

The result is straightforward: "applicant for admission" and "alien seeking admission" both refer to an alien who requests lawful entry into the United States. In other words, an applicant for admission is seeking admission. It's that simple.

**2. Text of Section 1225(a)(1)**

Section 1225(a)(1) is also relevant here. It states as follows:

> An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

8 U.S.C. § 1225(a)(1). Petitioners admit that, pursuant to this provision, they are "applicant[s] for admission" because they are aliens who entered the country unlawfully, making them "alien[s] present in the United States who ha[ve] not been admitted." *Id.*; *see id.* § 1101(13)(A) (defining "admitted" as "lawful entry"). Of course, Petitioners are not actually applying for entry, much less lawful entry; they entered the country illegally and have lived here for years. But Section 1225(a)(1) tells us that an individual in that position nevertheless is to be considered an "applicant for admission."

To understand how Section 1225(a)(1) functions, we must examine its text, which directs that an alien present in the United States who has not been admitted or who arrives in the country "shall be deemed . . . an applicant for admission." "Deem" means "[t]o regard as; consider." American Heritage Dictionary 487; *see also* Black's Law Dictionary 415 (6th ed. 1990) ("To hold; consider; adjudge; believe; condemn; determine; treat as if; construe."). The title of the paragraph conveys the same meaning: "Aliens *treated as* applicants for admission." 8 U.S.C. § 1225(a)(1) (emphasis added). Therefore, an alien arriving in the United States or present without having been lawfully admitted shall be considered—regarded as, treated as—an applicant for lawful entry. Such a person shall be considered an applicant for admission whether or not he is actually seeking lawful entry. For example, an alien "who arrives in the United States . . . not at a designated port of arrival" is actually *avoiding* lawful entry and not applying for anything. *Id.* But Section 1225(a)(1) tells us, for purposes of Chapter 12, to treat that person as "an applicant" for lawful entry.

The Supreme Court has understood the word "deemed" this way in a similarly phrased statute. In *Sturgeon v. Frost*, the Court considered a statute that provides: "'Only those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this Act) *shall be deemed* to be included as a portion of such unit.'" 139 S. Ct. 1066, 1076 (2019) (quoting 16 U.S.C. § 3103(c)) (emphasis added). "As a matter of geography, both public and non-public lands" fell within unit boundaries. *Id.* at 1081. But because of the deeming language, "as a matter of law, only public lands would be viewed as doing so." *Id.* As the Supreme Court explained, the term "deemed" "is used in legal materials '[t]o treat (something) as if . . . it were really something else,'" such as "by 'deeming something to be what it is not' or by 'deeming something not to be what it is.'" *Id.* (quoting Black's Law Dictionary 504 (10th ed. 2014)). In *Sturgeon*, the statutory phrase "[o]nly . . . public lands . . . shall be deemed to be included," 16 U.S.C. § 3103(c), meant that "only public lands . . . would *be considered* part of" a conservation system unit, "even though" non-public lands also "in fact fall within [the unit's] geographic boundaries," *Sturgeon*, 139 S. Ct. at 1077 (emphasis added). As a result, non-public lands located inside system units were "declared outside them" for legal purposes, such that those lands were "no longer subject to the" National Park Service's authority over system units. *Id.* at 1081. Thus, "deeming something to be what it is not" has real effect; it is not merely a matter of labeling. *Id.* (internal quotation marks omitted).

The same is true here. An alien present in the United States who has not been admitted isn't actually applying for lawful entry. And an arriving alien may not be either—he may be sneaking across the border or seeking lawful status, not admission. But as a

matter of law for purposes of Chapter 12, all such individuals are to be regarded as applicants for admission.

**3. Putting it all together**

Reading Section 1225(a)(1) and (b)(2)(A) together definitively answers the question presented. Section 1225(a)(1) tells us to "deem[]" Petitioners to be applicants for admission. Section 1225(b)(2)(A), which applies "in the case of an alien who is an applicant for admission," therefore applies to Petitioners. As already discussed, an applicant for admission is an alien seeking lawful entry into the country. *See* 8 U.S.C. § 1101(13)(A) (defining "admission"); American Heritage Dictionary 89 ("apply" means "[t]o request or seek"). As applicants for admission, Petitioners are "alien[s] seeking admission." 8 U.S.C. § 1225(b)(2)(A); *see Jimenez-Rodriguez v. Garland*, 996 F.3d 190, 194 n.2 (4th Cir. 2021) (explaining that, because the petitioner was an "'alien present in the United States who has not been admitted,'" "he qualifies as someone 'seeking admission'" (first quoting 8 U.S.C. § 1225(a)(1), then quoting *id.* § 1182(d)(3)(A)(ii))). And they concede that an immigration officer determined that Petitioners are "not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). Section 1225(b)(2)(A) therefore requires DHS to detain Petitioners for removal proceedings.

**4. Petitioners' error in reading Section 1225(a)(1)**

Petitioners and the majority disagree with this straightforward interpretation of the statutory language. Principally, Petitioners contend that "applicant" does not carry its ordinary meaning in Section 1225, and so, although Section 1225(a)(1) declares them to be "applicants for admission," they nevertheless are not "seeking admission." Their

approach misreads Section 1225(a)(1) as a definition of the phrase "applicant for admission" and thereby strips that provision of its deeming function.

First, Petitioners and the majority err by construing "applicant for admission" as a term of art that Section 1225(a)(1) defines. Section 1225(a)(1) does not articulate a new meaning for the phrase "applicant for admission," introduced by the word "means" or "is." *See Groman v. Comm'r*, 302 U.S. 82, 86 (1937) (concluding that the relevant section "is not a definition" because "when an exclusive definition is intended the word 'means' is employed"); *Burgess v. United States*, 553 U.S. 124, 130 (2008) ("As a rule, [a] definition which declares what a term 'means' . . . excludes any meaning that is not stated." (internal quotation marks omitted)). Consider, by contrast, the INA section titled "Definitions," which repeatedly defines statutory terms for purposes of the immigration laws by saying, "[T]he term [X] means [Y]." 8 U.S.C. § 1101(a)(1)–(h). Notably, Section 1225(a)(1) is not located in Section 1101(a), where Congress defined terms "[a]s used in" Chapter 12. *Id.* § 1101(a). Nor did Congress write Section 1225(a)(1) like it did those definitions. Doing so would have been simple enough; the provision would say, "For purposes of this chapter, 'applicant for admission' *means* an alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters)." Of course, that is not what Congress wrote.

Congress's choice to describe two categories of aliens who "shall be deemed" applicants for admission does not define the term "applicant[s] for admission." Consider

an example. The sentence, "Tomatoes and cucumbers shall be deemed vegetables" does not define the term "vegetables." Rather, it means that tomatoes and cucumbers shall be treated as though they are vegetables, despite being botanical fruits. The deeming sentence alters how we regard tomatoes and cucumbers; it does not alter the definition of vegetables or limit the meaning of "vegetables" to solely "tomatoes and cucumbers." A vegetable remains a vegetable, and the deemed foods must be considered vegetables. The same would be true no matter what are deemed to be vegetables—be they botanical fruits, legumes, or chocolate chip cookies. The meaning of the term "vegetables" does not change in any of these scenarios, and its definition must be found elsewhere.

Likewise here, "applicant for admission" isn't defined to mean the two groups of aliens described in Section 1225(a)(1). The provision instead tells us how to regard those two groups of aliens for purposes of Chapter 12. Just as "vegetables" keeps its ordinary meaning, "applicant for admission" retains its definition as supplied by Section 1101(a)(13) and contemporary dictionaries. Section 1225(a)(1)'s deeming language conveys that, whatever "applicant for admission" means and whoever else it includes, the two identified groups of aliens shall be regarded as applicants for admission too.

The majority posits that Section 1225(a)(1) is not a "deeming provision" because some of the aliens it identifies "are in fact . . . applying for admission[] into the country," and there is "'no need for Congress to provide'" that those aliens "'be deemed' applicants for admission" when they qualify as "applicants for admission" under "the ordinary meaning of the phrase." Maj. Op. 24–25 (quoting *Hedin v. Thompson*, 355 F.3d 746, 749 (4th Cir. 2004)). In *Hedin*, on which the majority relies, this Court considered a provision

that states, "'Active service of commissioned officers of the [Public Health] Service shall be deemed to be active military service in the Armed Forces of the United States for purposes of all laws related to discrimination on the basis of race, color, sex, ethnicity, age, religion, and disability.'" 355 F.3d at 748 (quoting 42 U.S.C. § 213(f)). We rejected the argument that "active service" meant "active military service" because that interpretation would obviate the need for Congress to "deem" active service to be active military service. *Id.* at 748–749.

The comparison to *Hedin* is inapt because Section 1225(a)(1) indisputably covers aliens who would not be "applicants for admission" within the ordinary meaning of that phrase. An "alien present in the United States who has not been admitted" is not actually applying for lawful entry. 8 U.S.C. § 1225(a)(1). Nor is an alien "who arrives in the United States . . . not at a designated port of arrival." *Id.* The parenthetical phrase "whether or not at a designated port of arrival" sweeps in some aliens who, upon arriving at a designated port of arrival, actually do request lawful admission. *Id.* But that fact does not eliminate the need for the deeming provision or counsel against reading the statute according to its plain text.[2]

The majority also claims that "the word 'deemed' is used in different ways" throughout the INA and the United States Code more generally. Maj. Op. 26. Even if that

[2] Later, the majority relies on *Hedin*'s observation that when the broader statutory scheme at issue in that case "addresse[d] a certain kind of 'active service,' including military-type service, it expressly modifie[d] the term 'active service' to indicate this limitation." 355 F.3d at 749; *see* Maj. Op. 27–28. The cited laws that utilized the modified term were not discrimination laws, so the deeming provision did not apply to them, a point the majority overlooks in its attempt to analogize this case to that one.

were true, it does not absolve us of our responsibility to decipher how the word functions in the context of Section 1225(a)(1).[3] Like all English speakers, Congress occasionally uses the same word in different ways, but we may not throw up our hands at the prospect of interpreting the written text. *See*, *e.g.*, *Pulsifer v. United States*, 144 S. Ct. 718, 736 (2024) (observing Congress's differing use of conjunctions even within the same statutory section). As explained above, the word "deem" means "regard as; consider"; "treat as if." American Heritage Dictionary 487; Black's Law Dictionary 415; 8 U.S.C. § 1225(a)(1) (title). And in *Sturgeon*, the Supreme Court demonstrated how to interpret and apply a similarly worded provision.

Second, by construing Section 1225(a)(1) as a definition, Petitioners and the majority treat "applicant for admission" as a mere label, draining it of meaning and neutering Section 1225(a)(1)'s deeming function. Section 1225(a)(1) does more than dictate that every time we see the phrase "applicant for admission" we should understand it to include aliens arriving or present in the country without admission. By instructing that those aliens "shall be deemed" applicants for admission, Section 1225(a)(1) places those aliens in the posture of applicants for admission, with all that entails. As *Sturgeon* demonstrates, deeming one thing to be another as a matter of law has consequences. *See*

---

[3] The majority cites *TC Heartland LLC v. Kraft Food Groups Brands LLC*, 581 U.S. 258 (2017), for the proposition that the word "deemed" sometimes "defines a term of art." Maj. Op. 26. That's not quite right. In *TC Heartland*, the Supreme Court considered statutes that defined the words "residence" and "reside" and then "deemed" a corporation to reside in the defined place for venue purposes. 581 U.S. at 262–263, 265–266, 269. The word "deemed" created the legal fiction that a corporation "resides" anywhere; it did not define the term "resides" or "residence." *See id.* at 262, 266–267.

139 S. Ct. at 1081. Otherwise, "[t]here is no reason" "to create a special legal fiction" in the first place. *Id.* at 1083.

Put differently, Section 1225(a)(1) does not say that aliens arriving or present in the United States who have not been admitted "shall be called" applicants for admission. It says they "shall be deemed" applicants for admission. And an applicant for admission is an alien who "request[s]" or "seek[s]" lawful entry to the country. American Heritage Dictionary 89; *see* Webster's New World College Dictionary 67; 8 U.S.C. § 1101(a)(13)(A). As an applicant for admission, therefore, an alien who illegally entered the country is necessarily considered to be "seeking admission." 8 U.S.C. § 1225(b)(2)(A).

Petitioners insist that they are not "alien[s] seeking admission" for purposes of Section 1225(b)(2)(A) because they are not *actually* seeking lawful entry to the country. That argument ignores the effect of Section 1225(a)(1). The statute deems aliens who *actually are not* applying for admission to be so. By deeming Petitioners to be persons who apply for admission, Section 1225(a)(1) deems them to be persons who seek admission. Any other conclusion disregards the ordinary meaning of the words "applicant" and "seeking." *See* Webster's New World College Dictionary 67, 1215; American Heritage Dictionary 89; Merriam Webster's Collegiate Dictionary 56, 1057. There is no indication that Congress has assigned specialized definitions to those words in this context, therefore the ordinary meanings apply. Accordingly, although aliens present in the United States who have not been admitted are not actually applying for or seeking admission to the country, Section 1225(a)(1) tell us to regard them as though they are.

### 5. Petitioners' surplusage objection

Petitioners object that this reading is fatally flawed because it renders "seeking admission" and "applicant for admission" duplicative in Section 1225(b)(2)(A). That argument lacks force.

As the Supreme Court has acknowledged, "[t]he anti-surplusage canon is useful, but it is 'subordinate to the cardinal canon that a legislature says in a statute what it means and means in a statute what it says there.'" *Mullin v. Al Otro Lado*, 146 S. Ct. 2079, 2093 (2026) (quoting *U.S. Postal Serv. v. Konan*, 146 S. Ct. 736, 746 (2026)); *see id.* at 2092 ("The anti-surplusage canon is not an iron rule."). "[E]ven excellent writers do not always trim every unnecessary word, and the same is true of Congress." *Id.* at 2092. "Sometimes the better overall reading of the statute contains some redundancy." *Rimini Street, Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019).

So it is here. Section 1225(b)(2)(A) uses different words to refer to synonymous concepts. *Cf. Tyler v. Cain*, 533 U.S. 656, 664 (2001) ("Congress, needless to say, is permitted to use synonyms in a statute."). The statute mentions the same alien twice: once in the prefatory clause as "an alien who is an applicant for admission" and once in the operative clause as "an alien seeking admission."[4] As previously discussed, an applicant is one who seeks. Because the terms' ordinary meanings overlap, there is some redundancy between them. But as the Supreme Court has repeatedly observed when interpreting the

---

[4] As the Eighth Circuit has explained, Congress did not structure Section 1225(b)(2)(A) such that "applicant for admission" and "alien seeking admission" are independent conditions that must be separately satisfied for detention under the statute. *See Avila v. Bondi*, 170 F.4th 1128, 1134–1135 (8th Cir. 2026).

immigration laws, "redundancies are common in statutory drafting—sometimes in a congressional effort to be doubly sure, sometimes because of congressional inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication." *Barton v. Barr*, 140 S. Ct. 1442, 1453 (2020); *see also Pugin v. Garland*, 143 S. Ct. 1833, 1842 (2023) (same); *Al Otro Lado*, 146 S. Ct. at 2092–2093 ("[E]xamples of redundancy [are not] uncommon." (internal quotation marks omitted)). And "if forced to choose between an interpretation that entails some redundancy and one that contradicts what words usually mean, we [sh]ould choose the former." *Al Otro Lado*, 146 S. Ct. at 2094.

Indeed, Congress used this "belt and suspenders approach" another time in this very same statutory paragraph. *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020). Section 1225(a)(2) provides that "[i]n no case may a stowaway be considered an applicant for admission." 8 U.S.C. § 1225(a)(2). Because Section 1225(b)(2)(A) applies only to "an alien who is an applicant for admission," it could never apply to stowaways. But Congress expressly exempted them anyway. *See id.* § 1225(b)(2)(B)(iii) ("Subparagraph (A) shall not apply to an alien . . . who is a stowaway."); *id.* § 1225(b)(2)(A) ("Subject to subparagraphs (B) and (C) . . ."). The repetition is redundant and unnecessary, but it does not nullify Congress's intent to exclude stowaways from Section 1225(b)(2)(A), it clarifies it. With respect to the INA, then, "rigorous application of the canon [against surplusage] does not seem a particularly useful guide to a fair construction of the statute." *King v. Burwell*, 576 U.S. 473, 491 (2015).

The construction espoused by Petitioners and the majority, moreover, "creates a far worse surplusage problem than the one it purports to solve." *Hernandez Alvarez v. Warden*, 175 F.4th 1258, 1296 (11th Cir. 2026) (Lagoa, J., dissenting). In their view, only aliens arriving at a designated port of entry and "presenting themselves for inspection and authorization to lawfully enter" are "seeking admission." Maj. Op. 31. Under that reading, the bulk of Section 1225(a)(1)—the part deeming aliens present in the United States who have not been admitted and those who arrive between designated ports of entry as "applicant[s] for admission"—does no work in Section 1225. That's because every provision that applies to an applicant for admission also uses the phrase "seeking admission," which, in Petitioners' and the majority's view, narrows the group to only those aliens arriving at a designated port of arrival pursuing lawful entry. *See* 8 U.S.C. § 1225(a)(3), (a)(5), (b)(2)(A).[5] Indeed, their construction renders Section 1225(b)(2)(A)'s prefatory clause—"in the case of an alien who is an applicant for admission"—entirely superfluous.

Thus, on Petitioners' reading, Congress took pains to include aliens present in the United States who have not been admitted and those arriving between ports of entry in the class of "applicants for admission" at the beginning of Section 1225 but then specifically excluded those groups "from every operative consequence in the section where the phrase

[5] The majority may respond that Section 1225(a)(3) mentions aliens "seeking admission" in the alternative, such that all "applicants for admission" remain subject to "inspect[ion] by immigration officers" even under its reading. 8 U.S.C. § 1225(a)(3). If that were the case, the mismatch it would create between inspection authority and the other provisions of Section 1225 would be further cause for skepticism about the majority's construction.

appears." *Hernandez Alvarez*, 175 F.4th at 1296–1297 (Lagoa, J., dissenting); *see Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 504 & n.10 (5th Cir. 2026). That makes little sense. And redundancy in one sentence in Section 1225(b)(2)(A) "is not a license to . . . eviscerate another portion of the statute," namely Section 1225(a)(1), "contrary to its text." *Barton*, 140 S. Ct. at 1453.

Equally troubling, the construction that Petitioners and the majority embrace makes Section 1225(b)(2) conflict with itself. Recall that they construe Section 1225(b)(2)(A)'s detention provision to reach only aliens arriving at a designated port of entry "presenting themselves for inspection and authorization to lawfully enter." Maj. Op. 31. Then consider subparagraph (C), which states that some "alien[s] described in subparagraph (A) [are] arriving on land . . . not at a designated port of arrival." 8 U.S.C. § 1225(b)(2)(C). An alien arriving in the United States "not at a designated port of arrival" is *not* pursuing lawful entry but rather is attempting to *evade* inspection by entering the country elsewhere. *Id.* Congress expressly included that alien among those "described in subparagraph (A)," *id.*, meaning that alien is "seeking admission," *id.* § 1225(b)(2)(A). Yet if "seeking admission" means what the majority and Petitioners claim—"affirmative steps towards lawful entry" by presenting oneself for "inspection and authorization," Maj. Op. 29, 31—an alien arriving "not at a designated port of arrival" would not qualify, 8 U.S.C. § 1225(b)(2)(C). Section 1225(b)(2)(C) reveals that "seeking admission" is not as limited as Petitioners and the majority claim.

### B. Statutory Context

Several features of the statutory context confirm that an applicant for admission is seeking admission. The statutory context also demonstrates that Congress did not limit Section 1225(b)(2)(A) to aliens arriving in the United States as Petitioners contend. Petitioners' contrary argument about Section 1226 is not sufficiently weighty to overcome the text and context of Section 1225.

#### 1. Applicants for admission and seeking admission

Congress used "applicant for admission" and "seeking admission" together in two other provisions of Section 1225, each of which confirms that applicants for admission are seeking admission.

*Inspection*: Section 1225(a)(3) provides, "All aliens (including alien crewmen) who are *applicants for admission or otherwise seeking admission* or readmission to or transit through the United States shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3) (emphasis added). The phrase "or otherwise" implies a relationship between the phrases it connects. When used this way, the principal meaning of "otherwise" is "in a different way or manner." Merriam Webster's Collegiate Dictionary 823 (as in, "glossed over or [otherwise] handled"); *see* Webster's New World College Dictionary 959 ("in another manner"). The most natural reading of Section 1225(a)(3), then, indicates that being an "applicant[] for admission" is one "way or manner" of "seeking admission" and that aliens also can seek admission in "a different way or manner." *See Lopez-Campos v. Raycraft*, 175 F.4th 713, 747 (6th Cir. 2026) (Murphy, J., dissenting) ("[T]he paragraph conveys that being an 'applicant for admission' is *one* of several ways of 'seeking

admission.'")). In other words, applicants for admission are included in the broader group of aliens seeking admission.

Congress used "or otherwise" the same way elsewhere in the same statute that enacted Section 1225(a)(3), the Illegal Immigrant Reform and Immigrant Responsibility Act (IIRIRA). For example, one provision reaches anyone who "murders or otherwise causes death, bodily injury, or serious bodily injury to an individual." Pub. L. No. 104-208, Div. C, Title II, § 203(e)(2)(E)(i), 110 Stat. 3009-567 (1996). Murder is a way of causing death—it is included within the broader term that follows "or otherwise." Another provision authorizes States to "prohibit or otherwise limit or restrict" alien eligibility for public assistance programs. 8 U.S.C. § 1624(a). Prohibiting is a way of limiting—again, the first term is included within the broader term that follows "or otherwise." This consistent usage suggests a consistent meaning. *See Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning." (internal quotation marks omitted)). And applying that meaning to Section 1225(a)(3), "applicants for admission" are "seeking admission."

*Statements*: Two paragraphs later, Section 1225(a)(5) provides, "An *applicant for admission* may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of *the applicant* in *seeking admission* to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible." 8 U.S.C. § 1225(a)(5) (emphases added). This provision presumes that

an "applicant for admission" is "seeking admission." Obviously, "[o]ne cannot have purposes and intentions in seeking admission without seeking admission." *Hernandez Alvarez*, 175 F.4th at 1294 (Lagoa, J., dissenting). Like Section 1225(a)(3), Section 1225(a)(5) also supports the interpretation dictated by the ordinary meaning of the terms: applicants for admission are seeking admission.[6]

Moving beyond Section 1225 itself, other provisions of the INA use the phrase "seeking admission" or "applying for admission" in ways that include aliens present in the country after unlawful entry.

*Parole*: Consider, for example, the parole provision. It gives the Secretary of Homeland Security discretion to "parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any *alien applying for admission* to the United States." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). Such parole, however, does not constitute "an admission," and when an alien's parole ends, "his case shall continue to be dealt with in the same manner as that of *any other applicant for admission* to the United States." *Id.* (emphasis added). The circuit courts to have addressed this provision agree that it authorizes parole relief for aliens present in the country after an illegal entry because they

[6] The majority adopts the Tenth Circuit's assertion that Section 1225(a)(5) shows "'that applicants for admission *can* be seeking admission, not that they must be.'" Maj. Op. 29 n.9 (quoting *Santillan Quiroz v. Mullin*, 180 F.4th 1226, 1245 (10th Cir. 2026)). That conclusion, however, is based not on the text of the statute but on a hypothetical sentence that does not parallel Section 1225(a)(5)'s structure because it omits the "regarding" clause and, particularly, the use of a definite article to refer back to "the applicant." *See Santillan Quiroz*, 180 F.4th at 1245.

are "applicants for admission." *See Cruz-Miguel v. Holder*, 650 F.3d 189, 198 (2d Cir. 2011); *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1116 (9th Cir. 2007). Thus, under the parole provision, aliens present in the country after unlawful entry are "alien[s] applying for admission" because they are "applicant[s] for admission." 8 U.S.C. § 1182(d)(5)(A). "It would be incongruous" to hold that an alien present in the country after an illegal entry qualifies "as an 'alien applying for admission' under the parole provision . . . but not an 'alien seeking admission' under the detention provision." *Lopez-Campos*, 175 F.4th at 751 (Murphy, J., dissenting).

*Lawful Permanent Residents*: The INA's definition of "admission" includes an exception for aliens who are lawfully admitted for permanent residence and seek to reenter the country after a trip abroad. "An alien lawfully admitted for permanent residence in the United States shall not be *regarded as seeking an admission* into the United States for purposes of the immigration laws unless" a listed carveout applies. 8 U.S.C. § 1101(a)(13)(C) (emphasis added). One carveout treats this lawful permanent resident "as seeking an admission" if he "is attempting to enter at a time or place other than as designated by immigration officers or *has not been admitted to the United States after inspection and authorization by an immigration officer*." *Id.* § 1101(a)(13)(C)(vi) (emphasis added). In other words, this provision clarifies that a lawful permanent resident who, on return to this country, sneaks in without inspection is treated as "seeking an admission" even though he is already present in the country. *See Lopez-Campos*, 175 F.4th at 752 (Murphy, J., dissenting). Such a resident is in the same position as Petitioners: After entering the country illegally, both groups are "regarded as" seeking admission. This

provision further confirms that the law sometimes treats aliens present after an illegal entry as "seeking admission," and it undermines Petitioners' reading of that phrase, which reaches only aliens who request lawful entry after inspection at a designated port of arrival.

**2. Arriving aliens in Section 1225**

Statutory context also demonstrates that if Congress intended to limit Section 1225(b)(2)(A) to arriving aliens as Petitioners contend, it would have done so expressly as it did elsewhere in Section 1225. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009) (internal quotation marks and brackets omitted).

In Section 1225, Congress repeatedly distinguished between *arriving* aliens and those *present* here. In subsection (a), Congress identified both "present" aliens and those who "arrive[]" in the United States as applicants for admission. 8 U.S.C. § 1225(a)(1). The expedited removal process in subsection (b)(1) then distinguishes between them. In one provision, it authorizes immigration officers to order the speedy removal of aliens "arriving in the United States." *Id.* § 1225(b)(1)(A)(i); *see also id.* § 1225(b)(1)(A)(ii) (regarding asylum claims by aliens "arriving in the United States"). In another provision, it authorizes the Attorney General to apply the expedited removal process to a subset of aliens who have been "present in the United States" for a certain period of time. *Id.* § 1225(b)(1)(A)(iii)(II). Later in Section 1225, Congress provided for the removal of "an arriving alien" who is suspected to be inadmissible on certain security-related grounds. *Id.* § 1225(c)(1). And in Section 1225(b)(2) itself, Congress specified that, in the case of an

alien "arriving on land" from a contiguous foreign territory, the Attorney General may return the alien to that territory pending removal proceedings. *Id.* § 1225(b)(2)(C).

By contrast, the detention provision in Section 1225(b)(2)(A) draws no distinction between arriving aliens and those present in the United States. It covers any "alien who is an applicant for admission." *Id.* § 1225(b)(2)(A); *see Jennings*, 583 U.S. at 287 (Section 1225(b)(2) "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)."). Congress expressly limited other parts of Section 1225 to arriving aliens. But it did not do so here.[7] We can safely "presume[]" that Congress acted "intentionally and purposely" to convey that Section 1225(b)(2)(A) is not limited to arriving aliens. *Nken*, 556 U.S. at 430 (internal quotation marks omitted).

Petitioners and the majority assert that the phrase "seeking admission" accomplishes the result of limiting Section 1225(b)(2)(A) to arriving aliens. But that position is difficult to square with the four parts of Section 1225 discussed above, where Congress specifically said "an alien . . . who is arriving" or "arriving alien" when that was what it meant. *See* 8 U.S.C. § 1225(b)(1)(A)(i), (ii); *id.* § 1225(b)(2)(C); *id.* § 1225(c)(1). Those provisions are strong evidence that Congress did not use the materially different phrase "alien seeking admission" when it meant "arriving alien." We must honor Congress's conspicuous choice not to limit the detention provision to aliens who are "arriving."

[7] The majority foists its own "graduated framework" of "[d]etention [c]ategories" onto Title 8 of the U.S. Code. Maj Op. 36, 40. Within its framework, the majority characterizes Section 1225(b)(2) as applying to "[a]rriving noncitizens seeking admission." Maj. Op. 38. But Congress did not limit Section 1225(b)(2) to "arriving" aliens; the majority plucks that word out of thin air and inserts it into the text.

Petitioners repeat their refrain that "seeking admission" can only happen at the border because that is where "entry" occurs. *See* 8 U.S.C. § 1101(13)(A) (defining "admission" as "lawful entry"). But that argument again fails to give effect to the deeming function of Section 1225(a)(1). In Section 1225(a)(1), Congress instructed that an "alien present in the United States"—who is not at the border but has already crossed it—shall be deemed an applicant for lawful entry. *Id.* § 1225(a)(1); *id.* § 1101(13)(A). For purposes of Chapter 12, then, we must regard an alien who has already entered this country illegally and remains present here as though he were applying to enter. The "deeming" is necessary precisely because that person is not actually attempting to enter the country, or to do so legally. Petitioners' argument that entry occurs at the border simply fights against what Congress has decreed. We must consider that alien, who is "present" in the United States, to be requesting entry because Congress has so instructed. *Id.* § 1225(a)(1).

**3. Section 1226**

The majority reasons that applying Section 1225(b)(2)(A)'s mandatory detention provision to aliens like Petitioners would render portions of Section 1226(c) "largely unnecessary." Maj. Op. 32. Of course, a provision that is partly necessary is not "meaningless" or "superfluous," which is the threshold for the interpretive canon on which the majority relies. *Bilski v. Kappos*, 561 U.S. 593, 607–608 (2010); *see Corley v. United States*, 556 U.S. 303, 314 (2009); Maj. Op. 32 (citing *Bilski* and *Corley*). In any event, Section 1226 does not counsel a different reading of Section 1225.

Section 1226 authorizes the Attorney General to arrest and detain "an alien" pending removal proceedings and permits release on bond "[e]xcept as provided in subsection (c)."

8 U.S.C. § 1226(a). Because Section 1226 applies to "an alien" without qualification, it covers a much broader group than Section 1225(b)(2), including inadmissible aliens who were admitted erroneously or because of fraud, aliens who overstay their visas, and others who become deportable on many different grounds. *See Buenrostro-Mendez*, 166 F.4th at 504–505. For certain "criminal aliens," Section 1226(c) eliminates the possibility of bond and requires the Attorney General to "take [them] into custody." 8 U.S.C. § 1226(c). These include aliens who are "deportable" by reason of certain acts and offenses, *id.* § 1226(c)(1)(B), (C), (D), and those who are "inadmissible" who have committed or been charged with certain acts or offenses, *id.* § 1226(c)(1)(A), (D), (E). Each subparagraph applies to some aliens beyond the reach of Section 1225(b)(2)(A) and is therefore not superfluous. In addition, Section 1226(c) imposes a more restrictive release regime than Section 1225(b)(2)(A). Aliens detained under Section 1225(b)(2)(A), including those present without having been admitted, are generally eligible for parole under Section 1182(d)(5)(A). Aliens described in Section 1226(c) are not. *See id.* § 1226(c)(4). "[T]he two provisions are 'not superfluous' under any interpretation." *Lopez-Campos*, 175 F.4th at 753 (Murphy, J., dissenting) (quoting *Nielsen v. Preap*, 586 U.S. 392, 415 (2019)).

What about the Laken Riley Act, which Congress passed in 2025? *See* Pub. L. No. 119-1, 139 Stat. 3 (2025). Among other things, the Act added a new ground of mandatory detention in subparagraph (E) of Section 1226(c)(1) for inadmissible aliens who committed or are charged with certain crimes. *See* 8 U.S.C. § 1226(c)(1)(E). As previously mentioned, newly enacted subparagraph (E) applies to some aliens beyond the reach of Section 1225(b)(2)(A)—for example, aliens who have procured admission into the United

States by fraud. *See id.*; *id.* § 1182(a)(6)(C). However, subparagraph (E) overlaps with existing law in some respects, even under Petitioners' interpretation. For example, subparagraph (E) requires that arriving aliens who are inadmissible because they lack documentation or make misrepresentations shall be detained if they admit committing certain offenses. *Id.* § 1226(c)(1)(E). But even under Petitioners' reading, all arriving aliens who are inadmissible because they lack documentation or make misrepresentations must be expeditiously removed or otherwise detained, even if they haven't committed any other criminal offense. *See id.* § 1225(b)(1)(A)(i), (B)(ii), (B)(iii)(IV).

The majority focuses on subparagraph (E)'s application to aliens who are present in the United States without being admitted or paroled. *See id.* § 1226(c)(1)(E); *id.* § 1182(a)(6)(A). In the majority's view, if Section 1225(b)(2)(A) already requires that those aliens be detained pending removal, then there was no need for Congress to add in subparagraph (E) that they must be detained if they have committed or are charged with certain crimes. While this clause is another instance of overlap in subparagraph (E), it is not superfluous because it eliminates the possibility of parole that would otherwise be available to these individuals under Section 1182(d)(5)(A). Moreover, Congress enacted the Laken Riley Act at a time when DHS had long followed a practice of offering bond pending removal to aliens present in this country who had entered unlawfully, even those charged with serious crimes. *Lopez-Campos*, 175 F.4th at 754 (Murphy, J., dissenting).

No circuit court had opined on the practice.[8] Given that legal landscape, when Congress clarified that the Attorney General must take into custody individuals covered by subparagraph (E), its action changed the status quo.

At bottom, however, the intent of the 119th Congress when it passed the Laken Riley Act in 2025 cannot tell us the meaning of the detention provision in Section 1225(b)(2)(A), which a different Congress enacted in 1996. *See Rodriguez Vazquez v. Bostock*, 183 F.4th 1160, 1207–1208 (9th Cir. 2026) (Bea, J., dissenting) ("[I]t is well-established that 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 520 (1992))). The fact that the 119th Congress did not undertake a more sweeping revision of Section 1225 or 1226 "to correct the Executive Branch's misunderstanding," Maj. Op. 34, tells us only what that Congress intended to accomplish in 2025. It tells us nothing about what Section 1225(b)(2)(A) meant decades earlier when it was enacted, which is the meaning that continues to control until Congress amends it. *See Wisc. Cent. Ltd.*, 585 U.S. at 284 ("Until [Congress] exercises that power, the people may rely on the original meaning of the written law."); *Watson v. Republican Nat'l Comm.*, 146 S. Ct. 2165, 2189 (2026) (Alito, J., dissenting) ("Statutes enacted decades after the fact are seldom probative" of "what the statute meant at the time it became law.").

[8] The majority claims that "all three branches of the federal government" have for decades interpreted Section 1226 to apply to aliens present in the country after illegal entry and Section 1225 to apply only to arriving aliens. Maj. Op. 14. But the majority does not cite a single federal court holding as much, or even addressing the question presented, before this year.

#### 4. Constitutional avoidance

The majority invokes the constitutional-doubt canon, which advises that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *U.S. ex rel. Att'y Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909). The canon has no place here because the correct interpretation of the detention provision at Section 1225(b)(2)(A) does not "raise[] serious constitutional doubts." *Jennings*, 583 U.S. at 286; *see Demore v. Kim*, 538 U.S. 510, 526 (2003) (describing the Supreme Court's "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings"). Indeed, the majority does not specify what it considers to be the serious constitutional problem posed by this interpretation. Instead it gestures at two inflated concerns that shrivel upon the slightest scrutiny.

First, the majority asserts that the Government's interpretation would subject aliens present in the country after illegal entry "to mandatory detention with no recourse to the constitutional protections that have long been held to apply to them." Maj. Op. 49. That is incorrect. The Government's interpretation would require that aliens not clearly and beyond a doubt entitled to be admitted be detained without bond (but with the possibility of parole) during their removal proceedings. The majority undertakes no analysis of whether detaining these aliens with the option of parole instead of bond during the pendency of their removal proceedings would violate any due process rights they have concerning that temporary detention. Instead, the majority appears to assume that *any*

detention of these aliens pending their removal would violate the Due Process Clause. That is wrong. *See Demore*, 538 U.S. at 531 ("Detention during removal proceedings is a constitutionally permissible part of that process" for aliens present in the United States.); *see also id.* at 523–531 (holding that due process does not require individual bond hearings for criminal aliens detained pending removal pursuant to Section 1226(c)); *Reno v. Flores*, 507 U.S. 292, 303–306 (1993) (holding that due process does not require individual "best interest" hearings for juvenile aliens detained pending removal); *Carlson v. Landon*, 342 U.S. 524, 537–542 (1952) (holding that due process does not require individual dangerousness or flight-risk findings to detain communist aliens pending removal). The Government's interpretation of Section 1225(b)(2)(A) does not curtail the constitutional limits on detention, which continue to apply. *See*, *e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("A statute permitting indefinite detention of an alien would raise a serious constitutional problem.").

Second, the majority asserts that the Government's interpretation does away with "well-established" "procedural safeguards" that apply before aliens "who have 'passed through our gates, even illegally, may be expelled.'" Maj. Op. 47 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)). That is false. Neither party's interpretation of the detention provision in Section 1225 has any effect on the procedural safeguards that DHS and the Executive Office for Immigration Review must follow before ordering a person removed from the country. *See* 8 U.S.C. § 1229a; 8 C.F.R. §§ 241.1–241.15, 1240.1–1240.17.

The majority clearly has strong views about what it considers the "moral implications" of denying individuals bond during their removal proceedings. Maj. Op. 47; *see id.* at 50–51 (comparing detention during removal proceedings to "internment camps"). But application of the constitutional-doubt canon must be grounded in the Constitution.

### C. Statutory History

Statutory history also aligns with the conclusion dictated by the text and context: applicants for admission are seeking admission and Section 1225(b)(2)(A) reaches beyond aliens arriving at designated ports of entry. Petitioners' speculation about congressional silence and reliance on agency practice cannot overcome the uniform direction of these authoritative guides to statutory meaning.

#### 1. IIRIRA

The changes that Congress made to the mandatory detention provision in IIRIRA refute Petitioners' argument that it applies only to aliens at the border. Before 1996, the detention provision applied only to arriving aliens. Congress had used various formulations to communicate this limitation. As the majority recounts, the Immigration Act of 1893 provided: "[I]t shall be the duty of every inspector of *arriving* alien immigrants to detain for a special inquiry . . . every person who may not appear to him to be clearly and beyond doubt entitled to admission." § 5, 27 Stat. 569, 570 (emphasis added). In the Immigration Act of 1903, Congress stated the detention obligation thusly: "Every alien who may not appear to the examining immigrant inspector *at the port of arrival* to be clearly and beyond a doubt entitled *to land* shall be detained for examination in relation

thereto by a board of special inquiry." Pub. L. No. 57-162, § 24, 32 Stat. 1213, 1219–1220 (emphases added).

The INA of 1952 carried this language forward, stating: "Every alien (other than an alien crewman) . . . who may not appear to the examining immigration officer *at the port of arrival* to be clearly and beyond a doubt entitled *to land* shall be detained for further inquiry to be conducted by a special inquiry officer." Pub. L. No. 82-414, § 235(b), 66 Stat. 163, 199 (emphases added). Congress revised this text in early 1996, a few months before it enacted the current language of Section 1225(b)(2)(A) in IIRIRA. The amended provision continued to cover only arriving aliens. It provided: "[I]f the examining immigration officer determines that an alien seeking *entry* is not clearly and beyond a doubt entitled to *enter*, the alien shall be detained for a hearing before a special inquiry officer." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 422(a), 110 Stat. 1214, 1271 (1996) (amending 8 U.S.C. § 1225(b)) (emphases added). The word "entry" was defined to mean "any coming of an alien into the United States, from a foreign port or place or from an outlying possession[.]" 8 U.S.C. § 1101(a)(13) (1994).

In IIRIRA, Congress departed from all those prior constructions of the mandatory detention provision. It abandoned any reference to "arriving alien immigrants," "the port of arrival," "land[ing]," and "entry." Instead, Congress for the first time grouped aliens present without having been lawfully admitted together with arriving aliens, including those arriving away from a lawful port of entry. It enacted a provision deeming them all "applicants for admission." 8 U.S.C. § 1225(a)(1). And then it specified that the detention

mandate applies to that group: "in the case of an alien who is an applicant for admission." *Id.* § 1225(b)(2)(A).

"[W]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995). If Congress had meant to keep the detention provision limited to arriving aliens, it could have used any of the prior statutory formulations. *See Lopez-Campos*, 175 F.4th at 755 (Murphy, J., dissenting). But it did not. Congress instead conspicuously diverged from "a century of settled drafting" to craft a different mandatory detention provision that reaches "applicant[s] for admission," a group that includes aliens present in the country without having been lawfully admitted. *Hernandez Alvarez*, 175 F.4th at 1298 (Lagoa, J., dissenting); *see* 8 U.S.C. § 1225(a)(1), (b)(2)(A). Petitioners and the majority would give this amendment no effect. The detention provision's statutory history strongly indicates that Petitioners' construction is incorrect.

**2. Clear statement**

The majority objects that Congress would not have enacted such a significant change to our nation's immigration detention system "without greater clarity." Maj. Op. 46. After all, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). But Congress *did* speak clearly in IIRIRA when it jettisoned all prior formulations of the detention provision that applied solely to arriving aliens and explicitly extended that provision to cover aliens present in the country who have not been admitted. And Congress made this change exactly where we would expect it to do so; Section 1225

is no "ancillary provision[]" or "mousehole[]." Maj. Op. 46 (internal quotation marks omitted). Congress opened Section 1225 with a clear statement that aliens present in the United States who have not been admitted shall be deemed applicants for admission. 8 U.S.C. § 1225(a)(1). Then it amended the detention provision itself—not some marginal clause elsewhere—to clarify that it now applies "in the case of an alien who is an applicant for admission." *Id.* § 1225(b)(2)(A).

Nor is this a situation where Congress has delegated significant discretion to an executive agency, which delegation sometimes requires a clear statement from Congress. *See Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 638–639 (2026). Rather, Congress has imposed a *restraint* on the Executive by mandating the detention of all aliens covered by Section 1225(b)(2)(A) instead of leaving the Executive with discretion over detention decisions. Consider Section 1226, which affords the Attorney General substantial discretion to detain non-criminal aliens arrested under that section or release them on bond or conditional parole. 8 U.S.C. § 1226(a), (b); *see id.* § 1226(e) ("The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review."). In Section 1225(b)(2)(A), by contrast, Congress circumscribed the Executive's discretion when it comes to applicants for admission.

**3. Inference from congressional silence**

Petitioners and the majority next attribute meaning to congressional silence based on inferences from legislative history. When Congress enacted IIRIRA, some representatives opined that Section 1226(c) would require the detention of approximately 45,000 criminal aliens each year. Maj. Op. 48 (citing H.R. Rep. No. 104-469, pt. 1, at 118,

120, 123). So IIRIRA allowed the Attorney General to delay implementation of Section 1226(c) for two years. Maj. Op. 48 (citing Pub. L. No. 104-208, § 303(b)(2), 110 Stat. 3009, 586–587 (1996)). At the same time, some representatives reported that there were approximately two million aliens in the United States who had entered the country illegally. Response Br. 49 n.13 (citing H.R. Rep. No. 104-469, pt. 1, at 111). The majority finds it "difficult to imagine" that Congress would have expressed concern about "the impact of mandatory detention" under Section 1226(c) while remaining silent about the strain on detention resources that the Government's interpretation of Section 1225(b)(2)(A) supposedly entails. Maj. Op. 48.

This kind of speculation is a poor basis for judicial decisionmaking. For one thing, it favors neither side because the Government "has never had sufficient detention capacity to maintain in custody every single person described in section 1225," under any interpretation. *Biden v. Texas*, 142 S. Ct. 2528, 2535 (2022) (internal quotation marks omitted). For another matter, inferences could just as easily be drawn the opposite direction. Perhaps Congress read Section 1225(b)(2)(A) to grant the Executive "more enforcement discretion over arrests" than Section 1226(c). *Lopez-Campos*, 175 F.4th at 756 (Murphy, J., dissenting) (internal quotation marks omitted). After all, Section 1226(c) requires the Attorney General to "take into custody" a covered criminal alien "when the alien is released" from criminal custody. 8 U.S.C. § 1226(c)(1). Section 1225(b)(2)(A), by contrast, requires detention only after a determination by "the examining immigration officer." *Id.* § 1225(b)(2)(A). Or perhaps Congress thought the broader parole provision it adopted would alleviate detention capacity concerns. *See Lopez-Campos*, 175 F.4th at

756 (Murphy, J., dissenting) (noting that the parole provision Congress adopted is broader than "the narrow version in the House Report" on which Petitioners and the majority rely).

More fundamentally, this argument must be rejected because courts are not at liberty to "replace the actual text [of a statute] with speculation as to Congress' intent." *Oklahoma v. Castro-Huerto*, 142 S. Ct. 2486, 2496 (2022) (internal quotation marks omitted). "Congress expresses itself as a body through the text it enacts." *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd*, 146 S. Ct. 1546, 1558 (2026). The text of the law therefore "controls over purported legislative intentions unmoored from any statutory text." *Castro-Huerto*, 142 S. Ct. at 2496; *see also Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (rejecting purposive speculation in favor of "apply[ing] faithfully the law Congress has written").

**4. Agency practice**

Finally, Petitioners and the majority emphasize that, for three decades, the Executive has detained aliens present in the United States without admission under Section 1226(a)'s discretionary scheme rather than Section 1225(b)(2)(A)'s mandatory scheme. This practice tells us nothing about the meaning of the latter statute. *Cf. Pereira v. Sessions*, 585 U.S. 198, 204–205 (2018) (rejecting an interpretation of the INA that reflected 21 years of government practice); *Pub. Emps. Ret. Sys. of Ohio v. Betts*, 492 U.S. 158, 171 (1989) ("Even contemporaneous and longstanding agency interpretations must fall to the extent they conflict with statutory language.").

"Courts must exercise their independent judgment" in interpreting the law. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). Although an agency's reasoned

interpretation can be persuasive in determining a statute's meaning, *see id.* at 2262, here Petitioners have not identified any reasoned agency decision adopting their construction of Section 1225(b)(2)(A). Rather, the relevant agencies announced their policy of nonenforcement in one conclusory sentence soon after IIRIRA's enactment. *See* 62 Fed. Reg. 10312-01, 10323 (Mar. 6, 1997) ("Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination."). At the same time, the agencies adopted a regulation, still in force, that applies Section 1225(b)(2) to mandate detention for certain aliens present in the country who have not been admitted, thereby acknowledging the Executive's authority under that provision even if exercising it only in part. *See* 8 C.F.R. § 235.3(b)(1)(ii) (requiring detention "in accordance with section 235(b)(2) of the Act" for an "alien who was not inspected and admitted or paroled into the United States but who establishes that he or she has been continuously physically present in the United States" for two years).

Neither "authority granted by Congress" nor a mandate issued by Congress can "evaporate through lack of administrative exercise." *Bankamerica Corp. v. United States*, 462 U.S. 122, 131 (1983) (internal quotation marks and brackets omitted). "We know that unquestioned powers are sometimes unexercised from lack of funds, motives of expediency, or the competition of more immediately important concerns." *United States v. Morton Salt Co.*, 338 U.S. 632, 647–648 (1950). That the Executive long preferred the flexibility of Section 1226(a) over the rigidity of Section 1225(b)(2)(A) is unsurprising and is not evidence that the latter authority was never conferred. Nor can such exercises of

executive discretion alter the meaning of the statutory text Congress enacted and that this Court must faithfully apply.

* * *

In sum, the statutory text, context, and history supply a ready answer to the question presented. Section 1225(b)(2)(A) requires the Government to detain aliens who illegally entered the United States pending the outcome of their removal proceedings. Petitioners, therefore, have failed to show that they are "in custody in violation of the . . . laws . . . of the United States." 28 U.S.C. § 2241(c)(3). Accordingly, I would deny their habeas petitions and reverse the district court's judgments.